## STATE v. GERALD E. GOWDY.

113 N. W. (2d) 578.

March 2, 1962—No. 37,997.

---

[1]Vossen v. Thulin, 244 Minn. 351, 70 N. W. (2d) 287.

*Gerald E. Gowdy,* pro se, for appellant.

*Walter F. Mondale,* Attorney General, *George M. Scott,* County Attorney, and *Theodore R. Rix,* Assistant County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant, Gerald E. Gowdy, was indicted by the grand jury for the crime of murder in the first degree. He was arraigned on June 3, 1959. A plea of not guilty was entered. The court then ascertained that he was without counsel and unable to procure one in his own behalf. The public defender was appointed to represent him. The case was called for trial on June 9, 1959, so the public defender had ample opportunity to confer with defendant. At that time defendant signed a written waiver of a jury trial, and the case proceeded to trial before the court without a jury. The court found defendant guilty of murder in the first degree. He was sentenced to the State Penitentiary for life. The appeal here is from the judgment after denial of defendant's motion for a new trial.

The material facts are not seriously in dispute. Defendant and one John Alfred Brewer came to Minnesota for the express purpose of

committing a robbery. The first night here they spent on the Iron Range. They were both armed, defendant with a .38-caliber revolver and Brewer with an automatic revolver, both of which defendant had stolen prior thereto. On May 11, 1959, they drove to Duluth, where they purchased some ammunition for Brewer's automatic pistol. They then drove to Minneapolis for the purpose of committing a robbery there. They first went to a Red Owl Store at 2124 East Lake Street in Minneapolis. They left their guns in the glove compartment of their automobile and entered the store unarmed to purchase some food and to look the store over to try to find the location of the cash register. Some time thereafter, after eating in the car, they took the guns from the glove compartment. Defendant put his in his belt and Brewer put his in his pocket, and they again entered the store. It was then about 7:30 p. m. They approached a sales girl by the name of Gail Patrick and asked her to call the manager. When the manager, Ralph H. Scheffler, appeared, defendant told him: "There's a gun in your back; this is a holdup." They proceeded to the office with Scheffler. Miss Patrick entered the office, and defendant had his gun out. He motioned to her to stay in there but then allowed her to return to the service counter to wait on customers. He demanded that Scheffler open the safe, and, at the request of Scheffler, Miss Patrick proceeded to procure a key for the safe from Charles E. Sather, an employee in the meat department. When she did so, she gave a prearranged signal to the meat department that a holdup was in progress, and Sather, before returning with the key, called the police department. Thereafter the safe was opened and $500 in bills given to defendant. Defendant testified that he told Scheffler, Sather, and Miss Patrick to lie down on the floor so that no one would get hurt. At about this time the police arrived at the store. Apparently Brewer observed the entrance of the police and said to defendant, "We better get out of here." Both men left the office and went by the service counter. Up to this point there is little dispute in the testimony. Defendant contends that he remembers nothing from the time he heard Brewer say, "Jerry, the cops are here," until he came to in the hospital.

The ensuing events were related by testimony of several police officers and a witness who was injured by a gunshot wound in the af-

fray that followed. Police detective Wayne K. Leonard, having heard the radio call that a holdup was in progress, went to the Red Owl Store. As he ran into the store through the service door and Patrolman Witt ran in through the front door, Leonard saw defendant and Brewer running toward him. He grabbed defendant, and Witt grabbed Brewer. After telling defendant that he was under arrest, Leonard told him to drop his gun. Defendant said, "You will have to kill me," and did not comply. Officer Witt struck defendant on the wrist with his pistol in an effort to dislodge defendant's gun but failed to do so. Leonard then struck him on the back of the head with his pistol. Defendant thereupon turned and fired his pistol at Leonard, and Leonard fired back. It is not clear which fired first since the shots apparently were almost simultaneous. Defendant ran toward the door and apparently fell and got up and ran again. Leonard ran after him and, after trying the wrong door, made his exit through a door onto the sidewalk, and as he came out to the sidewalk he saw Sergeant William F. Herkal, Jr., another police officer who had arrived at the scene. Herkal was holding his chest and coughing or groaning, and defendant at that time was falling on his face. Leonard later disarmed defendant.

Patrolman Durwood L. Witt arrived at the store at about the same time as Leonard, and he ran in and grabbed Brewer. Upon being told to put up his hands, Brewer did not do so immediately but kept them in his pockets. After the first shots mentioned above, Brewer complied with Witt's orders to get down on the floor and permitted himself to be disarmed. He had a pistol in his pocket with the safety off but offered no further resistance.

R. Walter Zabel, a pedestrian bystander, testified that he was outside the store and that he saw defendant run out of the door, swing his gun at Sergeant Herkal and shoot and then swing his gun at and shoot Zabel. Zabel suffered a minor gunshot wound.

Patrolman Jacob A. Lindgren approached the store with other officers in a squad car in time to see defendant emerge from the store and shoot at Sergeant Herkal. Lindgren eventually felled defendant by firing a riot gun at him.

An autopsy conducted on the body of Herkal by the county coroner and a pathologist on the staff of Minneapolis General Hospital

established that the cause of death was loss of blood into the chest cavity from a tear in the aorta from a bullet which was found in the body. Ballistics established that the bullet came from the gun carried by defendant. Herkal was shot twice, one bullet passing through his body.

There can be no doubt but that defendant shot and killed Herkal. Defendant does not dispute this fact. His contentions on this appeal are (1) that the evidence is insufficient to sustain a conviction of murder in the first degree, and (2) that he was deprived of substantial constitutional rights before or during the trial, which will be discussed hereinafter.

It is defendant's first contention that murder in the first degree does not lie because there was no premeditation but that the evidence sustains only a conviction of murder in the third degree. He bases this on the fact that Minn. St. 619.07,[1] defining murder in the first degree, requires evidence of a premeditated design to effect death and that, since defendant neither knew nor disliked the deceased, he had no intention of killing anyone and, therefore, the requirements of the statute are not fulfilled. He admits that the evidence would sustain a conviction of murder in the third degree as defined in § 619.10.[2]

■ We have held that "[p]remeditation, being a process of the mind, and a design, likewise being a product of the mind, are wholly subjective and hence incapable of direct proof. They must be inferred

---

[1]"The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when perpetrated with a premeditated design to effect the death of the person killed or of another, and shall be punishable by imprisonment for life in the state prison."

[2]"Such killing of a human being, when perpetrated by act eminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual, or without a design to effect death, by a person engaged in the commission of, or in an attempt to commit, any felony, except rape, assault with an attempt to commit rape, indecent assault, or sodomy, either upon or affecting the person killed or otherwise, is murder in the third degree, and shall be punished by imprisonment in the state prison for not less than seven, nor more than 30, years."

from objective manifestations."[3] Premeditation may be inferred from all the circumstances surrounding the homicide.[4] Nor is it necessary that the design to effect death exist for any specific length of time.[5] Here the evidence establishes beyond any doubt that defendant and Brewer entered the store armed with loaded revolvers, ready to shoot, if necessary, anyone who obstructed their purpose of robbing the store; that in an attempt to escape capture defendant shot at several people; and that at arm's length he discharged his loaded revolver into a vital area of the body of Sergeant Herkal, causing his immediate death. From these facts an inference is clearly permissible that defendant had a premeditated design to shoot and kill anyone who got in his way. It is not necessary that he have a premeditated design to effect the death of a specific person. It is enough that he had a premeditated design to kill, if necessary, anyone who interfered with his plan to rob the store or to escape capture.

■ Defendant next contends that, inasmuch as Brewer was permitted to plead guilty to the crime of murder in the third degree, defendant could not be charged or convicted of a greater degree of the same offense for the reason that they were both principals in the commission of the same crime. What defendant fails to recognize is that he is not being prosecuted here for the crime of robbery but, instead, for the crime of murder. The difference in the participation of the two in the consummation of the ultimate crime of murder is obvious. When Brewer was caught he gave up. Defendant alone continued to fight. If defendant had done as Brewer did, there would have been no killing. He alone perpetrated the killing in an attempt to escape. While it might be said that Brewer also intended to use his gun, if necessary, when he entered the store, he abandoned that intent when apprehended by the police officers. From that time on the crime of Brewer consisted of being a participant in the robbery which ultimately led to a killing, but he took no direct part in the killing itself. Under these circumstances, there was ample room for the exercise of the court's

[3]State v. Gavle, 234 Minn. 186, 197, 48 N. W. (2d) 44, 51.
[4]State v. Keaton, 258 Minn. 359, 104 N. W. (2d) 650.
[5]State v. Brown, 41 Minn. 319, 43 N. W. 69.

discretion in permitting Brewer to plead guilty to a lesser degree of the homicide.

■ Defendant contends that after being struck on the head by Detective Leonard he remembers nothing of the events that transpired; hence that he could have no premeditated design to effect the death of Herkal. When ordered to lay down his arms, he refused to do so and stated that he would have to be killed. He started firing after being struck and continued to fire until the six shots in his revolver were all discharged. At arm's length, he shot and killed Herkal. After killing Herkal, he continued his attempt to escape, first shooting at and wounding a bystander, Zabel. While he claims to remember nothing, he now claims an inconsistency in the testimony of a witness who said that Herkal was in uniform, it being defendant's contention that he was dressed in civilian clothes. The evidence falls far short of supporting his claim to a loss of memory.

■ Defendant assigns a number of errors which he claims deprived him of a fair trial. First he contends that he was pressured into waiving a jury trial. He was represented by a competent public defender. He signed a written waiver, as required by § 631.01. At no time during the trial did he indicate any dissatisfaction with his choice to be tried by the court. Obviously this contention is without merit.[6]

---

[6]The record shows the following proceedings when the case was called for trial:

"THE COURT: Mr. Lohmann [counsel for defendant], what do you propose to do?

"MR. LOHMANN: The defendant, your Honor, pleads not guilty and would like to waive a jury, would like to have the case tried by the Court without a jury.

"THE COURT: You understand, do you, Mr. Gowdy, that you are entitled to a jury trial?

"THE DEFENDANT: Yes, sir.

"THE COURT: You are waiving a jury of your own free will, is that right?

"THE DEFENDANT: Yes, sir.

"THE COURT: You understand that you are entitled to a jury trial?

"THE DEFENDENT: Yes.

"THE COURT: I think he might be put under oath."

Defendant being sworn, was then examined by the court and testified as follows:

Defendant also advances the usual claim that his counsel was inadequate and incompetent. The public defender appointed to represent defendant is a man of many years' experience. The record shows no lack of adequacy in representation. Defendant virtually admits the material facts leading up to the shooting. His main thrust here is against a conviction of murder in the first degree. The errors he alleges in connection with his representation by counsel could have no bearing on a determination of the facts as to what actually took place. An examination of the record discloses that counsel did everything to protect defendant that could be done.

Finally, defendant claims that he was compelled to attend trial while in a physical and mental state that prevented his full comprehension of the evidence adduced at the trial. It is true that defendant had not fully recovered from the wounds he received in his encounter with the police officers. The record, however, completely fails to substantiate his claims in other respects. He testified in his own behalf. It appears from the record that he did so lucidly and intelligently. Records of medical personnel of the hospital disclose that in their opinion he was able to attend the trial without any danger to his health. Apparently it is only after conviction and imposition of sentence that it has

---

"Q   Now, Mr. Gowdy, I will ask you again, it's your desire to waive a jury trial, is that right?

"A   Yes, sir.

"Q   You are doing this of your own free will and accord?

"A   Yes, sir."

Defendant then signed a waiver of trial by jury and the following occurred:

"THE COURT: The defendant having signed a waiver, the Court will now proceed with the trial of this case without a jury. The waiver will be filed.

"MR. SCOTT [Hennepin County Attorney]: Your Honor, the State waives an opening statement.

"THE COURT: Very well.

"MR. SCOTT: Just for the record I would like to indicate that this waiver was signed in open court by the defendant, in the presence of defense counsel and the Court.

"THE COURT: Very well."

occurred to defendant that he was mentally and physically unfit to stand trial. No motion was made for continuance by defendant or his counsel.

An examination of the entire record in this case amply sustains his conviction of murder in the first degree. There can be no question but that defendant shot and killed Herkal. He was apprehended in the act, and a number of eyewitnesses testified as to the actual shooting. While no witness saw the entire occurrence, the combined testimony of all establishes a continuous chain of events in which defendant was clearly shown to have shot and killed the police officer in an attempt to escape after being apprehended. We find no error in the record that would justify a new trial or a reversal of the conviction.

On December 27, 1961, defendant filed in this court a motion for appointment of counsel to assist him on his appeal. The case was set for hearing on January 4, 1962. At the time of the motion, briefs had been filed by defendant and the state. A thorough consideration of a complete transcript of the evidence and all the records and files herein has been made by the court. Appointment of counsel at this stage of the proceeding would not be justified, and the motion is therefore denied.

Affirmed.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the submission, took no part in the consideration or decision of this case.