STATE EX REL. GERALD E. GOWDY v.
RALPH H. TAHASH.*

169 N. W. (2d) 30.

June 13, 1969—No. 41439.

*John S. Connolly* and *Peter M. Mansur,* for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, and *J. Dennis O'Brien,* Special Assistant Attorney General, for respondent.

Heard before Knutson, C. J., and Murphy, Rogosheske, Sheran, and Peterson, JJ.

PER CURIAM.

Appeal from an order of the district court discharging a writ of habeas corpus issued subsequent to relator's conviction for the crime of first-degree murder. The issue in the habeas corpus proceeding was whether relator was competent to have stood trial for that crime.[1] The issue on appeal is whether there is evidentiary support for the district court's findings that relator was competent to stand trial and that he was adequately represented by counsel at trial. We hold that there was such evidentiary support and that relator failed to sustain his burden of proof.

The evidence presented in the district court during the evidentiary hearing was twofold. We summarize it briefly merely to show the nature of the issue and character of the evidence adduced.

---

* Certiorari denied, 396 U. S. 993, 90 S. Ct. 490, 24 L. ed. (2d) 456.

[1] Relator's inferential claims are that he was denied a fair trial and the assistance of competent counsel, both of which claims were considered in his prior appeal from the conviction. State v. Gowdy, 262 Minn. 70, 113 N. W. (2d) 578. It should be noted that relator neither at the trial nor in this proceeding has claimed that he was not guilty of the crime by reason of insanity at the time of its commission.

First, counsel for relator in the original trial, the then public defender, Lewis E. Lohmann, testified with relator's express consent. Lohmann stated that he had extensive pretrial communication with both relator and relator's mother, from which he concluded that relator was "fully understandable and fully capable of standing trial." It was his observation that relator knew the offense with which he was charged and the consequences thereof; that he could clearly recall and relate the facts of the case; that he understood the evidence and the availability of numerous witnesses against him; that he himself suggested waiving a jury trial because of the manifest unlikelihood of a favorable jury verdict; that he actively aided and assisted his counsel in the defense; and that he made an "eloquent" statement in his own behalf. Lohmann, who had defended more than a thousand criminal cases in his 14 years as public defender, said, "I saw the man. I would never have stood trial with him if there had been any question in my mind that he didn't know what was going on—or in his mother's mind, either."

Second, Dr. William F. Sheeley, former chief of psychiatry at Minneapolis General Hospital, testified by deposition concerning his examination of relator on May 18, 1959, 3 weeks prior to trial. Relator was then hospitalized for near-fatal gunshot wounds sustained at the time of his apprehension. Sheeley had no independent recollection of relator's case but, during the deposition, had before him relator's medical chart, including his own consultation notes of a 1-hour examination on that date. He had observed and noted that relator had "great difficulty with serial subtractions" and in three instances evinced marked disorientation as to time; according to notations of nurses in the chart, moreover, relator evinced "a considerable amount of self-pity and self-centeredness." Sheeley at that time noted his agreement with the attending surgeon's request that relator be transferred to the psychiatric station of the hospital for a few days, after his urgent need of somatic care diminished, with a view to determining whether he was suffering from "chronic brain syndrome." [2] He did not, however, at that time "even come to tentative conclusions" either that relator suffered a chronic brain syndrome or that he was not competent to stand trial. The noted aberrations could, as Sheeley acknowledged, reflect simply

---

[2] Dr. Sheeley acknowledged that the psychiatric term "chronic brain syndrome" covers "a multitude of sins"—that "[i]t's such a broad thing that it sure doesn't say much when you say 'chronic brain syndrome.'"

a personality disorder or even faking;[3] and he noted that relator "speaks in a most intelligent and understanding manner" and that "[w]e should not overlook the possibility he may be looking to psychiatry as a way of escaping the consequences of his acts."

It is undisputed that no psychiatric evaluation of the kind suggested by Dr. Sheeley was ever made before or after relator's trial. Nothing in the record discloses why it was not done. It does not appear that the hospital authorities had, in the absence of such evaluation, made any recommendation against relator's transfer from the hospital to the courtroom to stand trial. Relator's counsel, not having been made aware of these medical suggestions, had not requested such evaluation and, having noted nothing unusual concerning his client's mental state, he did not make such request on his own initiative.[4]

Affirmed.

---

[3] Although at the time of the psychiatric consultation relator exhibited syndrome-suggestive disorientation with respect to his age and the season of the year, he exhibited no such disorientation at trial. He accurately gave his birthdate, his place of birth, the name and address of his mother, and similar biographical detail. As this court said in State v. Gowdy, 262 Minn. 70, 77, 113 N. W. (2d) 578, 583, "He testified in his own behalf * * * [and] did so lucidly and intelligently."

[4] Lohmann testified that he had in numerous other cases had occasion to make a request for psychiatric observation of his clients. He added that "on not a single occasion that I ever sent a man to Dr. Sheeley did he come back and find that the man was incompetent to stand trial."