**STATE of Minnesota, Respondent,**

v.

**Gary Lee COOPER, Appellant.**

No. CX–96–599.

Supreme Court of Minnesota.

March 27, 1997.

John M. Stuart, State Public Defender, Diamond Law Offices, James T. Diamond, Jr., Sp. Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

Appellant Gary Lee Cooper ("Cooper") appeals his conviction for the first-degree murder of Gregory Peterson ("Peterson"), asserting that the evidence introduced at trial was not sufficient to allow the jury to conclude that Cooper murdered Peterson with premeditation and intent to kill and that the state failed to prove that the killing was not justified by self defense. We affirm, holding that there was ample evidence to support a conviction of first-degree murder.

Cooper shot and killed Peterson outside the Minneapolis apartment of Cooper's girlfriend Lena Cartharn ("Cartharn") on March 1, 1995. Cooper was apprehended in Chicago, Illinois on July 20, 1995 and was tried for

murder in Hennepin County District Court on February 12–16, 1996.

Cartharn testified at trial that, on the night of the murder, she returned home from the grocery store at approximately 8:00 p.m. and she and several female friends gathered in her apartment to play cards. Cartharn stated that about 20 minutes after she got home Cooper arrived at the house carrying a gun under his coat. Cooper laid the gun down on the bed in Cartharn's bedroom and Cartharn subsequently put the gun in her bedroom closet to keep it away from the several children who were present in the apartment.

Cartharn further testified that shortly after Cooper arrived, Peterson knocked on the front door of the apartment. Cartharn answered the door, realized that Peterson was drunk, and told him to leave. Peterson resisted and, while Peterson was still standing in the entryway to Cartharn's apartment, Cooper approached and also told Peterson to leave. Peterson and Cooper exchanged harsh words and when Cartharn, who was standing between the two men, tried to push Peterson out the door and Cooper back into the house, Peterson swung around Cartharn and hit Cooper with a gin bottle. Peterson then left the entryway and Cooper went back inside the apartment.

According to Cartharn, the next thing she saw was Cooper standing outside the west side entrance to the apartment, holding the gun she had put in her closet. Peterson was still standing outside the main entrance to the apartment and, other than the bottle of gin in his hand, appeared to be unarmed. Cartharn said to Cooper "take that gun back in the house," and Peterson told Cooper to "put the gun down and fight like a man." At that point, Cooper said "you think I'm a whore" and started shooting. Cooper fired approximately 14 shots at Peterson in rapid succession as Peterson crawled from the gate surrounding the apartment building to the street. He ended up behind a car parked on the street.

Cartharn testified that Cooper did not need to shoot Peterson because Peterson was leaving anyway, and that, after the shooting, the other women and children in the apartment ran to the upstairs apartment of a neighbor. Cartharn tried to call the police but Cooper grabbed the phone saying "bitch, you not going to call nobody." Cooper then hid the gun under a dresser and demanded that Cartharn and her friend Tonya Jordan give him a ride. Cartharn and Jordan drove Cooper to the corner of 23rd and Emerson in Minneapolis and dropped Cooper off in the middle of the street. While Cartharn did not speak to police the night of the murder, she gave them a statement the next morning describing what had happened and turned over the gun.

Three of the other women present in Cartharn's apartment prior to the shooting also testified. Tonya Jordan, Patricia Martin, and Raeann Mausel testified that Cooper was acting "weird" and "hyper" when he first arrived at Cartharn's apartment. They further testified that, when Peterson came to the door, Cooper and Peterson began to argue in the entryway while Cartharn tried to get Peterson to leave the entryway and push Cooper back into the apartment. At that point the women retreated into Cartharn's bedroom. They next saw Cooper go into the bedroom, grab the gun, and exit the apartment out the west side door that enters into the bedroom. The women and children then left the apartment, ran to Martin's mother's apartment upstairs and heard Cartharn screaming "Coop, don't do that" and shots being fired. A short time later, Cooper came to the upstairs apartment and offered Jordan $40 to give him a ride, saying she had a choice of "$40 or a bullet." Although Jordan did not take the $40, Jordan and Cartharn did drive Cooper to 23rd and Emerson and drop him off.

Patricia Martin's brother Melvin testified that on March 1, 1995, he lived in the apartment directly above Cartharn's. Melvin stated that he was in his bedroom that night when he heard people arguing outside and looked out his window to see what was happening. Melvin testified that Cooper was arguing with another man, who Melvin later learned was Peterson. Cooper then left briefly, returned with a gun, and began shooting at Peterson. Melvin further stated that, at the time Cooper began shooting,

Cooper was standing on the sidewalk and Peterson was standing in the street. Peterson did not appear to be armed. Melvin estimated the distance between the two men at between 30 and 40 feet and stated that Cooper shot 15 to 20 times in rapid succession. When the shooting stopped, Melvin looked outside and saw Peterson crawling away from Cooper. Peterson crawled toward the sidewalk and collapsed.

David Lindman, a forensic scientist for the Crime Lab Unit of the Minneapolis Police Department, testified that bullets recovered from Peterson's body were fired by the gun found in Cartharn's apartment. He further stated that the weapon is a .22 caliber semi-automatic and, therefore, every time the gun is fired, the shooter must physically let up on the trigger and pull it again.

Assistant Hennepin County Medical Examiner Dr. Daniel Davis testified that Peterson's death was caused by "multiple gunshot wounds." Peterson was shot no less than twelve times: once in the upper torso, once in the left arm and the remainder in the pelvis and legs. While the shot to the torso passed through Peterson's lung and was determined to have been the fatal shot, Dr. Davis testified that the other shots could have caused Peterson to bleed to death if medical attention had not been made available within a reasonable period of time. Dr. Davis further testified that the shots appeared to have hit Peterson from different angles, indicating that either Peterson, the shooter or both were moving as the shooting was taking place, and it was likely that the fatal shot to the upper torso was delivered as Peterson was falling. He also stated, however, that it was not possible to determine which wounds were inflicted first as all of the wounds were probably received in rapid succession.

Cooper testified on his own behalf and offered a version of the events that differed substantially from that of the other witnesses. Cooper stated that he occasionally carried a gun when going to Cartharn's apartment because he had been approached by teenagers wielding guns in her neighborhood. He further stated that he had brought the gun used to kill Peterson to Cartharn's house several weeks before the killing, that she usually kept it in her room, but that, on that night, he removed the gun from Cartharn's bedroom and put it in Cartharn's children's room because there were guests sitting in her room. According to Cooper, at approximately 7:30 p.m. on March 1, Peterson began knocking on Cartharn's door and shouting "open the mother fucking door." Cooper stated that he became concerned at that point because people were often coming to Cartharn's house to buy drugs, so he went to the children's bedroom and retrieved his gun. After Cartharn opened the door, Cooper went and stood behind her in the entry way and, upon seeing Cooper's gun, Peterson said "I'm going to beat his ass and take his mother fucking gun." Cooper told Peterson not to "come over and disrespect this house," and Peterson then swung around Cartharn and hit Cooper in the face with a gin bottle. According to Cooper, he then pushed Cartharn out of the way and both men went out the front door and continued to exchange words on the sidewalk.

Cooper further testified that, as they argued, he was trying to back up but Peterson again swung at him with the gin bottle and Cooper began to slip. As Cooper fell backwards, he grabbed the fence and started shooting the gun. Cooper claimed that he was not shooting at Peterson's head or chest and was not trying to kill him, he was merely trying to stop Peterson from hitting him with the bottle again. He testified that he only remembered firing the first couple of shots and that the shooting lasted only five to seven seconds. He further stated that, contrary to Melvin's testimony, he did not approach the body after the shooting, but rather, he got scared, ran into the house, threw the gun on the floor, and ran upstairs to ask for a ride. Cooper denied threatening Jordan in order to get a ride, but admitted that Jordan and Cartharn did take him in Jordan's car and drop him off on Emerson Avenue.

The jury found Cooper guilty of one count of first-degree murder in violation of Minn. Stat. § 609.185(1) (1997). He was sentenced to a mandatory term of life imprisonment.

An individual is guilty of first-degree murder under Minn.Stat. § 609.185 if he "[c]auses the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn. Stat. § 609.185(1) (1997). Cooper asserts that the evidence introduced at trial was insufficient to allow the jury to conclude that he acted with premeditation and intent when he killed Peterson. In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the state and assume that the jury believed the state's witnesses and disbelieved contrary evidence. *State v. Moore,* 481 N.W.2d 355, 360 (Minn. 1992) (citing *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980)). "The question on review is whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *Id.* (citing *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981)). Because intent and premeditation are states of mind, they are generally proved circumstantially— by drawing inferences from the defendant's words and actions in light of the totality of the circumstances. *State v. Andrews,* 388 N.W.2d 723, 728 (Minn.1986) (citing *State v. Kirch,* 322 N.W.2d 770, 773 (Minn.1982)). Because the jury is in the best position to evaluate the credibility of witnesses and weigh the evidence, its verdict must be given due deference. *State v. Anderson,* 379 N.W.2d 70, 75 (Minn.1985); *see also Moore,* 481 N.W.2d at 360.

First, as to proof of intent, the criminal code defines the phrase "With intent to" as meaning: "the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn.Stat. § 609.02 subd. 9(4) (1997). Cooper asserts that the evidence produced at trial, even when viewed in the light most favorable to the verdict, was not sufficient to support a finding that he intended to kill Peterson. Cooper argues that, because his shots at Peterson were repetitive and without pause, they may have been fired from close range, and all but one of the bullets that hit Peterson struck him below the pelvis, the only reasonable inference is

that Cooper's intent was "solely to ensure that Mr. Peterson would be incapacitated and would desist in future efforts to harm [Cooper]."

In reviewing a jury's determination that a killing was intentional, the relevant inquiry is not whether the court believes that certain facts in the record are consistent with an unintentional killing. "Rather, the question is, could a reasonable jury conclude beyond a reasonable doubt that, despite [such] facts, the only reasonable inference to be drawn from all the evidence, now viewed most favorably to the state, is one of intentional killing?" *State v. Boitnott,* 443 N.W.2d 527, 532 (Minn.1989). In reaching its conclusion, the jury may infer that a person intends the natural and probable consequences of his actions and a defendant's statements as to his intentions are not binding on the jury if his acts demonstrated a contrary intent. *State v. Lundstrom,* 285 Minn. 130, 140, 171 N.W.2d 718, 724–25 (1969). Accordingly, "intent to cause death may be inferred from the manner of shooting." *Boitnott,* 443 N.W.2d at 531 (citing *State v. Harris,* 405 N.W.2d 224, 229 (Minn.1987)).

In this case Cooper shot Peterson no less than twelve times with a semi-automatic weapon. Thus, contrary to his assertion that the shots were "in one burst," Cooper had to pull the trigger at least twelve separate times. Because all but one shot hit Peterson below the waist, and the fatal shot to the torso came from an angle indicating it was shot while Peterson was down, the pattern of shots would seem to be consistent with shooting at someone as they tried to crawl away. Cartharn testified that Cooper did not have to shoot Peterson because Peterson was leaving. Melvin Martin testified that the men were over 30 feet apart when the shooting began and that, after being shot, Peterson was trying to crawl away from Cooper. If the jury credited the testimony of these witnesses, it could have easily concluded that the only reasonable inference to be drawn from the evidence was that Cooper, in firing twelve separate shots into Peterson as Peterson crawled away, intended to kill him.

Premeditation is defined by the criminal code as meaning "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18. "Premeditation must generally be inferred from the totality of the circumstances surrounding the crime." *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn. 1988) (citing *State v. Wahlberg*, 296 N.W.2d 408, 415 (Minn.1980); *State v. Lloyd*, 345 N.W.2d 240, 245 (Minn.1984)). A finding of premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation. *Moore*, 481 N.W.2d at 361 (citations omitted); *Andrews*, 388 N.W.2d at 728 (Minn.1986) (citing *State v. Lemire*, 315 N.W.2d 606, 610 (Minn.1982)). However, "the state must always prove that, after the defendant formed the intent to kill, some appreciable time passed during which the consideration, planning, preparation, or determination required by Minn.Stat. § 609.18 prior to the commission of the act took place." *Moore*, 481 N.W.2d at 361. Multiple gunshots are indicative of premeditation and, while a mere series of shots or blows may not, in itself, be sufficient to justify a finding of premeditation, we have stated that a long and severe attack may be enough. *State v. Richardson*, 393 N.W.2d 657, 664 (Minn. 1986); *State v. Smith*, 367 N.W.2d 497, 501 (Minn.1985); *State v. Neumann*, 262 N.W.2d 426, 431 (Minn.1978). We have further held that procuring a firearm from another part of the house and walking down a hallway to kill the victim is evidence of premeditation. *Bangert v. State*, 282 N.W.2d 540, 544 (Minn. 1979); *see also State v. Merrill*, 274 N.W.2d 99, 112 (Minn.1978) ("[Defendant's] actions in going into the kitchen, obtaining the knife, returning to the bedroom, and stabbing the victim numerous times reasonably imply that he had determined to kill [the victim]."). Finally, events occurring after a death, such as actions demonstrating that a defendant was more concerned with escape than with helping the victim, may also be used to infer premeditation. *Andrews*, 388 N.W.2d at 728–29.

If the jury believed the testimony of the witnesses, it could have reasonably concluded that, during the time in which Cooper went into Cartharn's bedroom, found the gun, and exited the side door, he determined that he was going to kill Peterson. Cartharn testified that after the initial confrontation between Cooper and Peterson at the front door, Cooper went back into the house and that the next time she saw him he was standing outside the side door holding the gun. According to Cartharn, when Cooper reappeared, Peterson was about to leave and the two men exchanged only a few words from a distance before Cooper started shooting. Melvin Martin similarly testified that, after hearing the two men arguing outside, he saw Cooper "leave and come back and start shooting." Finally, the other women in the apartment also testified that, after arguing with Peterson at the front door, Cooper went into Cartharn's room, grabbed the gun, exited out the side door, and started shooting. The fact that Cooper fired at Peterson at least twelve separate times and was then only concerned with fleeing the scene as quickly as possible, further support the jury's conclusion that the only rational hypothesis to be drawn from the evidence was that the killing was premeditated. As such, it is clear that the evidence was sufficient to support a finding of premeditation.

Finally, in his pro se supplemental brief, Cooper asserts that the evidence introduced at trial established that he killed Peterson in self defense. Three conditions must be satisfied to justify the use of deadly force in self defense:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Austin*, 332 N.W.2d 21, 24 (Minn. 1983) (citing Minn.Stat. §§ 609.06 and 609.065) (additional citations omitted). Once the issue of justification is raised, the state has the burden of proving beyond a reason-

able doubt that the killing was not justifiable. *Id.* at 23. Cartharn and Melvin Martin both testified that, except for the gin bottle he was holding, Peterson was unarmed. Cartharn also testified that Cooper did not have to shoot Peterson because Peterson was leaving and Melvin testified that Cooper and Peterson were standing between 30 and 40 feet from each other when the shooting started. The jury was free to believe this testimony and reject Cooper's assertion that he shot Peterson only after being attacked with the gin bottle for a second time. Once it did so, there was clearly sufficient evidence for the jury to conclude beyond a reasonable doubt that the killing was not justified.

In conclusion, the evidence introduced at trial was clearly sufficient to support the jury's finding that Cooper acted with premeditation and intent to kill when he shot Peterson and that Cooper's actions were not justified by self defense. We therefore affirm the judgment of the district court.

Affirmed.