STATE of Minnesota, Respondent,

v.

Kou MOUA, Appellant.

No. C6-03-359.

Supreme Court of Minnesota.

April 22, 2004.

---

Marie Wolf, State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, Darrell C. Hill, Assistant Ramsey County Attorney, St. Paul, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

Va Meng Yang was shot to death on September 26, 2001. An indictment was filed on October 31, 2001, charging appellant Kou Moua with four counts of first-degree murder in Va Meng Yang's death: (1) first-degree murder (premeditated) in violation of Minn.Stat. § 609.185, subd. (a)(1) (2000) (Count I); (2) first-degree murder (drive-by shooting) in violation of Minn.Stat. § 609.185, subd. (a)(3) (2000) (Count II); (3) first-degree murder (premeditated) for the benefit of a gang in violation of Minn.Stat. §§ 609.185, subd. (a)(1) and 609.229, subds. 2, 3(a), and 4(a) (2000) (Count III); and (4) first-degree murder (drive-by shooting) for the benefit of a gang in violation of Minn.Stat.

§§ 609.185, subd. (a)(3) and 609.229, subds. 2, 3(a), and 4(a) (2000) (Count IV). Following a mistrial, on November 19, 2002, a jury found appellant Moua guilty as to Counts I and II, and acquitted appellant as to Counts III and IV. On November 22, 2002, appellant was sentenced to an executed life term on Count I's premeditated first-degree murder conviction.

The relevant facts giving rise to Va Meng Yang's murder are as follows. In August of 2001, approximately one month before his murder, 23–year–old Va[1] moved to Minnesota from California. For most of the month he lived with a sibling, but about four days before his death he went to stay with his cousin, Mary Vang. Mary lived in the basement of a house located at 35 Jessamine in St. Paul.

Va, an alleged member of an Asian gang called the Oriental Loks (OLs), began forging checks, including Kentucky Fried Chicken checks, and asking teenage boys from the Mount Airy Boys (MABs) to cash the checks for him.[2] One of the MABs, Paul Her, became involved in check forgery with Va.

Several of the facts concerning what preceded the murder came from appellant's brother, Tou Bee Moua. During the investigation of Va's murder, Tou Bee was incarcerated, at which time he spoke with St. Paul police officer Sergeant Richard Straka, who was assigned to the case. Tou Bee told Sergeant Straka that earlier on the day of the shooting, members of the MABs were upset with Va and crying because Her was "locked up" as a result of the check forgery. According to Tou Bee,

---

1. Several individuals will be referred to by their first names throughout this opinion to avoid confusion with the similar surnames of other witnesses.

2. There was testimony at trial, although disputed, that the "Mount Airy Boys" is a gang made up of teenage boys from the Mount Airy housing projects and surrounding neighborhood who, among other things, meet at the Mount Airy Boys and Girls Club and play soccer together.

prior to the shooting Va acknowledged that members of the MABs were angry and blamed Va for the incarceration of Her.

While the statements and testimony given by several witnesses were inconsistent and contradictory throughout the case below, some facts leading up to the shooting are undisputed. On the night of September 26, 2001, several members of the MABs, including appellant's two brothers (Tou Bee Moua and Kong Meng Moua), Tommy Yang, Ge Vang, and Houa Vang, gathered at the Mount Airy Boys and Girls Club (the "Club") to celebrate a birthday. Also present at the gathering were non-MABs appellant,[3] Zoua Vang and the victim Va.

Around 9:45 p.m., Va called his cousin Mary on her cell phone and asked Mary to drive to the Club to "pick him up." Mary testified that Va sounded anxious and was speaking very fast throughout the conversation. Mary told Va that she would "pick him up" after she picked up her husband from work. When Mary refused to stop at the Club first, Va told her he would find another ride home.

Va then approached Zoua and repeatedly asked her for a ride home. At first Zoua refused to bring him home, but she finally agreed and Va waited by her car, a maroon Toyota Camry. Before meeting Va at her car, Zoua was approached by appellant, who was her friend, and he also asked Zoua for a ride home—a request she granted. With both Va and appellant as passengers, Zoua first drove Va to his cousin Mary's house at 35 Jessamine. Zoua testified that appellant was sitting in the front passenger seat, and Va was sitting directly behind her in the back seat.[4]

She testified that there was normal conversation in the car, with no hostility or tension. Zoua parked in the middle of the street in front of the house. Va shook hands with appellant and Zoua, said goodbye, and got out of the car. Moments later, appellant also exited the car. Zoua testified that she saw appellant and Va shake hands outside of the car.

After the handshake between appellant and Va, exactly what ensued is unclear. In her statements to the police and to the grand jury, Zoua testified that, although she was not paying attention to appellant and Va until she heard gunshots, appellant repeatedly shot Va in the arm and back as he turned and walked away toward the house at 35 Jessamine. However, at trial Zoua testified that when she looked back after hearing the gunshots, Va was "coming at" appellant.

At trial, appellant provided his own account of the events directly preceding the shooting. Appellant testified that after he shook hands with Va inside the car, Va exited. Needing to urinate, appellant also exited the car. Once there, appellant went to the back-side of the car. Va then asked him to distribute forged Kentucky Fried Chicken checks to members of the MABs and have them cash the checks. When appellant told Va that he did not want to "get into that stuff," Va responded, "[Y]ou can't be a puss." Va allegedly also told appellant that Va was going to "jump" appellant and essentially "beat him" out of the gang. Appellant testified that during this exchange, Va was "right in [his] face," moved toward him, and that appellant felt he was trapped between Va and the car. As a consequence of Va's threatening

---

3. Appellant testified that he is a member of the OL gang.

4. Zoua also gave conflicting statements and testimony that appellant's youngest brother, Kong Meng, was—and was not—in the back seat of the car.

stance, and the fact that Va was considerably larger than appellant—280 pounds to appellant's 140 pounds—appellant testified that he pulled out his .32 caliber gun and shot Va.

When appellant reentered the car, Zoua said to him, "What the f* * * did you do that for?" According to Zoua, appellant told her to "shut the f* * * up" and to not say anything to anybody. At appellant's request, Zoua then drove appellant back to the Club and dropped him off. Appellant testified that he walked home, got his mother's car, drove to the Lafayette Bridge, and threw the gun into the river below.

Neighbors witnessed the immediate aftermath of the shooting. At approximately 10:00 on the night of the shooting, the neighbor who lived across the street from 35 Jessamine heard at least three gunshots and immediately looked out of his bedroom window overlooking Jessamine. He observed a dark-colored car in the middle of the street with the front passenger-side door open, and a "stocky" man stumbling away from the car toward the house located at 35 Jessamine. He further observed the car leaving in a hurry. A second neighbor testified that after hearing gunshots in rapid succession he saw an early–90s model, maroon Toyota Camry driving away with two people in the front seat and one person in the back seat. He believed the driver was a young female and that both the person in the front passenger seat and the person in the back seat were male. A third neighbor also testified that he heard the gunshots in rapid succession.

As the neighbors gathered to assist the injured man, a resident of 35 Jessamine called 911 to request an ambulance. Paramedics were dispatched and arrived within four minutes of being called. One paramedic testified that when she arrived at the scene of the crime she found a responsive, Asian male in his early 20s who had been shot four times. The gunshot wounds were found at the top of Va's left shoulder, his right humerus, right scapula, and right buttock. The paramedics placed Va in the ambulance, administered oxygen and rushed him to Regions Hospital. At some point en route the paramedics were able to identify the victim as Va Meng Yang, with a birth date of May 2, 1978.

The trauma team at Regions Hospital, comprised of multiple physicians, was activated prior to Va's arrival. Dr. Randall Hofbauer, a member of the trauma team, was in charge of "airway," which involves both the initial assessment and management of airway issues. According to Dr. Hofbauer, when Va arrived at the hospital he was in shock, hypotensive, tachycardic, was in respiratory distress, and had multiple gunshot wounds. The trauma team decided that Va needed to go to the operating room for management of the bleeding from his wounds. At that time, the trauma team decided to control Va's airway through endotrachaeal intubation.

Dr. Hofbauer was standing near Va's head throughout his entire treatment and assessment preceding Va's move to the operating room, and testified that Va was responsive to questions regarding medical allergies and medical history. When Dr. Hofbauer told Va he was going to give him medication to sedate him and put a breathing tube in to help him breathe, Va said, "The people who shot me was ah, ah, ah, Kou, um, Kou Moua." Va then repeated himself, and also said another name, which Dr. Hofbauer could not recall.[5] Va was

5. This incident and the entire assessment and treatment of Va by the trauma team at Regions Hospital was videotaped and played for the jury. The tape also shows Va identifying someone with the name "Vang."

pronounced dead in the operating room at 1:06 a.m. on September 27, 2001.

Because several of the witnesses changed their testimony, the state relied heavily upon medical evidence in attempting to prove Va was not the aggressor in the events leading up to the shooting. The state called Ramsey County and Washington County medical examiner Dr. Michael McGee, a specialist in pathology and forensic pathology. Dr. McGee testified that the evidence supported the state's theory of the case that after appellant and Va shook hands, Va turned to walk away, and appellant began shooting Va and continued to do so as Va stumbled to the ground. Dr. McGee based his opinion on the location of the wounds, the angle of the wound tracks, which went from back to front, and up to down, and the close range of the shooting. He believed the wounds were consistent with a scenario where Va was exposing or presenting first his side and then his back to the firearm; that is, after shaking hands with appellant, Va turned and exposed the top of the shoulder as well as his back to appellant. In such a scenario, the shot to Va's upper right arm would have been the first wound received as Va turned, and the two wounds to the back area would have been received in an indeterminate order, with the final shot being delivered to Va's buttock region.

On cross-examination, Dr. McGee acknowledged that the wounds were also consistent with a scenario in which Va was "coming at" appellant when appellant began shooting. However, in order for this to be consistent with the physical evidence, Dr. McGee elaborated that Va would have had to have approached appellant very low to the ground, in what Dr. McGee described as a "one-armed push-up * * * a matter of inches from the ground." From that position, it would be plausible that the gunshot wound to the upper shoulder region was the first shot.

To account for the remaining gunshot wounds, Dr. McGee testified that Va, at 5 feet, 7 inches in height and 280 pounds, had to spin from this low, forward-facing position to a position with his back facing appellant. Dr. McGee further stated that if Va were charging at appellant in a position that low to the ground, the first shot from a .32 caliber gun would not spin the victim around on its own force; in fact, it would most likely make the victim land at the shooter's feet. Consequently, to account for the shots to the backside, Va had to spin around on his own strength.

In addition to the medical evidence, the jury heard from several key witnesses initially arrested as part of the investigation—Zoua, the driver of the vehicle, and appellant's two brothers, Tou Bee and Kong Meng. These three witnesses' statements and testimony evolved and changed several times during the course of the investigation and throughout the trial. The changes were significant.

In her statements to the police and in her grand jury testimony, Zoua stated that Kong Meng, appellant's youngest brother, was in the car and was shocked when he witnessed the shooting. Zoua also made statements and testified that Va had turned away from appellant when appellant took his gun out and shot Va in the back. Zoua later denied all such statements at trial, stating that Kong Meng was not in the car[6] and that Va was

---

6. Zoua testified for the prosecution at trial that Kong Meng was not in the car; however, when she was later called to the stand during the trial as a defense witness, she admitted that Kong Meng was in the car and that her previous testimony had been an attempt to protect him because he was young. Other witnesses also testified to seeing a third person sitting in the back seat of the car as it left the scene of the shooting.

"coming at" appellant at the time of the shooting.

Appellant's brothers also changed their statements and testimony. Tou Bee made statements to the police officers that members of the MABs were angry at Va because Paul Her had been incarcerated. In his comments to Sergeant Straka and in his grand jury testimony, Tou Bee said that the MABs had a ".32 revolver" and that appellant was the last person to have the gun. Tou Bee also admitted that he told appellant's girlfriend, Pajtshiab Ly, to make up an alibi for appellant on the night of the murder. Tou Bee retracted these statements at trial. Similar to the initial statements and testimony of his brother, Kong Meng also told police and testified to the grand jury that he had been in Zoua's car with Va and appellant on the night of the shooting, but later submitted an affidavit and testified at trial that he had not been in Zoua's car that same evening.

Zoua, Kong Meng, and Tou Bee made statements in affidavits and testified at trial that they knew Va as "K.B.," which stood for "Killer Brian," and that Va had a self-created reputation for violence and owning a gun. They had not previously made such statements, either to the police or to the grand jury. In explaining why their statements changed, all of the witnesses maintained that their original statements were "lies" resulting from police coercion. Tou Bee also stated that he lied because he wanted to get out of custody and get his mother's car back, which had been impounded during the investigation.

Audio tapes of the police interviews of Zoua and Tou Bee were played at trial. While the officers implied to the witnesses that the officers already knew many of the facts of the case, they repeatedly asked the witnesses to simply tell the truth in their own words. The officers allowed the witnesses to take breaks when they got emotional, offered to get Zoua a soda, and generally encouraged the witnesses to "do the right thing." They also assured Zoua that she would be released no matter what her answers were, but encouraged her to be honest nonetheless.

During the first trial,[7] the state made a motion requesting that the witnesses' statements to police officers be admissible as impeachment evidence and as corroboration of the grand jury testimony. The district court granted the state's motion as to impeachment, but indicated doubt that the statements would be admissible substantively.

At a pretrial hearing before the second trial, the district court indicated that it did not intend to re-open any issues already determined by the judge at the first trial. Later, during the trial, when the audio tapes were played for the jury, appellant's attorney asked the court for a contemporaneous impeachment instruction because he feared jurors would not be able to distinguish between testimony to be used for impeachment purposes only and substantive testimony. The court denied the motion, noting that at the end of the trial it "might have to amplify the standard JIG." At the conclusion of the trial, however, the court did not do so but instead instructed the jury that evidence consisted of "sworn testimony of the witnesses both on direct examination and on cross-examination regardless of which side called the witness." The court also gave the jury the standard instruction that evidence of a prior inconsistent statement "should be considered

---

7. Initially, appellant and the witnesses were represented by counsel, who later withdrew from the case. A second attorney was appointed to represent the appellant. The first trial, however, ended in a mistrial when the judge refused to make a record requested by defense counsel, and counsel walked out of the courtroom in front of the jury.

only to test the believability and weight of the witness's testimony." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.15(3) (4th ed.1999).

Appellant now appeals, contending that the district court erred in admitting the audiotaped police interviews as impeachment evidence, and that the evidence as a whole was insufficient as a matter of law to prove beyond a reasonable doubt that appellant was guilty of first-degree murder.

## I.

 We are first presented with the question of whether the district court erred in admitting audio tapes of the police interviews as impeachment evidence. Rulings on evidentiary matters rest within the sound discretion of the district court, and we will not reverse a district court's evidentiary ruling absent a clear abuse of discretion. *State v. Nunn,* 561 N.W.2d 902, 906–07 (Minn.1997) (citing *State v. Ture,* 353 N.W.2d 502, 515 (Minn.1984)). Reversal of an evidentiary ruling by the district court requires the appellant to prove "both that the district court abused its discretion in admitting the evidence and that the appellant was thereby prejudiced." *Id.* at 907 (citing *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994)). We will only reverse the district court's ruling "when the error substantially influences the jury's decision." *Id.*

 Appellant argues that the jury was presented with an overwhelming amount of impeachment evidence in the form of audiotaped statements to police officers, and that because the impeachment evidence was so extensive, the audio tapes were, in effect, admitted substantively, or for their truth.[8] Inadmissible "hearsay" is

defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). If a statement is offered to show something other than the truth of the matter asserted, for example to impeach a witness or to rebut a suggestion of police misconduct, it is not hearsay. *See State v. McDonough,* 631 N.W.2d 373, 388 (Minn.2001) (citing *State v. Martin,* 614 N.W.2d 214, 224 (Minn.2000); Minn. R. Evid. 613(b)); *Hennepin County v. Perry,* 561 N.W.2d 889, 894 (Minn.1997) (holding that a statement to police officers was not hearsay when it was elicited to rebut defense counsel's suggestion that police officers lied to defendant during his interview); *State v. Hanley,* 363 N.W.2d 735, 740 (Minn.1985) (concluding declarants statement was not hearsay because it was not offered to prove the truth of the matter asserted but rather to show that he lied to the police). As an initial matter, we hold that the audiotaped statements to police officers were not, in effect, admitted substantively.

When a prior inconsistent statement is admitted for impeachment purposes, the district court is often requested to instruct the jury that the statement is not evidence being admitted for the truth of the matter asserted and should not be considered in reaching the verdict. *McDonough,* 631 N.W.2d at 388 (citing *State v. Thames,* 599 N.W.2d 122, 126 (Minn.1999)). The fact that the jury hears two versions of "the facts" and chooses to reject the in-court testimony of a witness in favor of properly admitted out-of-court statements is not of concern to us as long as the court ensures that the evidence's relevance is not out-

---

8. Appellant concedes that the evidence of statements made by Zoua, Kong Meng, and Tou Bee in front of the grand jury is admissi-

ble substantively under Minn. R. Evid. 801(d)(1)(A) (2002) and *State v. Amos,* 658 N.W.2d 201 (Minn.2003).

weighed by unfair prejudice. Minn. R. Evid. 403; *see also State v. Ortlepp,* 363 N.W.2d 39, 43 (Minn.1985). Judge Learned Hand addressed this very issue in *DiCarlo v. United States,* 6 F.2d 364, 368 (2d Cir.1925), *cert. denied,* 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925) (cited in *Ortlepp,* 363 N.W.2d at 44, n. 1), in which he stated:

> The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury [sic] see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court.

Appellant's central contention is that even if the court deems the prior inconsistent statements as impeachment evidence, and not hearsay evidence, the statements should still be disallowed. In appellant's view, the state presented the jury with a "deluge of impeachment evidence, so intertwined with other evidence that the most well-meaning juror in the world could not separate what was useable evidence from what was not * * *."

The amount of impeachment evidence was admittedly extensive; however, it is obvious that the reason there was such overwhelming impeachment evidence is because the witnesses frequently changed their stories. It would be imprudent to deem extensive impeachment evidence as "prejudicial" when the evidence is a result of witnesses' own actions in repeatedly changing their stories or versions of the facts. Such a result would reward less-than-truthful witnesses and pervert the truth-seeking process. Here, taken together, the evidence admitted presented the jury with a complete picture and allowed the jury to determine witnesses' credibility against a backdrop of what they actually said throughout the proceedings and not just on the day of the trial. Additionally, as noted by the state, the statements made to police officers did not contain any further prejudicial evidence because such evidence was already presented to the jury as substantive evidence in the form of grand jury testimony.[9]

■■ In addition to the volume of impeachment evidence admitted by the district court, appellant also contends that the court should have granted his request to have a contemporaneous limiting instruction given to the jury at the time the impeachment evidence was admitted. In his view, the lack of such an instruction prejudiced him. While the district court did deny the request for the contemporaneous jury instruction, it gave the standard jury instruction at the conclusion of the trial that evidence of a prior inconsistent statement should be considered only to test the believability and weight of a witness's testimony. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG

9. Appellant contends that the admission of this evidence was similar to that in *State v. Dexter,* 269 N.W.2d 721 (Minn.1978), wherein the court held evidence of a prior inconsistent statement inadmissible because the prosecution merely sought to present, in the guise of impeachment, evidence which was otherwise not admissible. Such is not the case here. Here, many of the prior inconsistent statements were statements made to the grand jury and therefore admissible substantively. The prior inconsistent statements made to police were in large part duplications of the grand jury testimony and were offered to impeach the witnesses' testimony on the stand.

3.15(3) (4th ed.1999). While we do not disagree that a contemporaneous instruction may have been helpful to the jurors, there is no requirement in the law that such an instruction be given when a large amount of impeachment evidence is introduced. Moreover, the instruction to the jury at the conclusion of trial was beneficial to appellant—the court instructed the jury that *all* prior inconsistent statements were only admissible as to the believability of the witnesses, and did not tell the jurors that the grand jury testimony could be considered substantively. Consequently, it is unlikely that the jurors were confused about which prior inconsistent statements could be considered substantively and which could be considered to impeach, as they were instructed that all prior inconsistent statements were to be considered for impeachment purposes only.

Accordingly, we hold that the district court did not abuse its discretion in admitting the witnesses' statements to police officers as impeachment evidence. The evidence was properly admitted under the rules of evidence and its relevance and probative value clearly outweighed any prejudice to appellant.

## II.

■ Next, we must address the issue of whether the evidence was insufficient as a matter of law to prove beyond a reasonable doubt that appellant was guilty of premeditated first-degree murder. When reviewing the sufficiency of evidence in a criminal case, we "are limited to ascertaining whether, given the facts in the record and any legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the charged offense." *State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof of a reasonable doubt, could reasonably conclude that a defendant was proven guilty of the offense charged. *State v. McCullum,* 289 N.W.2d 89, 91 (Minn.1979) (quoting *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965)). We consider the evidence in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached. *State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978).

■ For the purposes of murder in the first degree, Minnesota Statutes define premeditation to mean to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission. Minn.Stat. 609.18 (2002). Premeditation requires a period of time to pass between the formation of the intent to kill and the execution of the plan. *State v. Moore,* 481 N.W.2d 355, 360 (Minn.1992). We have long recognized that premeditation requires no specific period of deliberation, nor extensive planning. *State v. Gowdy,* 262 Minn. 70, 75, 113 N.W.2d 578, 581 (1962); *State v. Richardson,* 393 N.W.2d 657, 664 (Minn.1986). However, the state must prove that some appreciable period of time passed after the defendant formed the intent to kill, during which the statutorily required consideration, planning, preparation, or determination took place. *See* Minn.Stat. 609.18 (2002).

■ Premeditation is defined as "a state of mind generally proved circumstantially by drawing inferences from a defendant's words and actions in light of the totality of the circumstances." *State v. Brocks,* 587 N.W.2d 37, 42 (Minn.1998) (citing *State v. Andrews,* 388 N.W.2d 723, 728 (Minn.1986)). Multiple gunshot wounds and the brutality of the killing may be evidence of premeditation. *Id.; State v. Cooper,* 561 N.W.2d 175, 180 (Minn.1997).

The totality of circumstances includes events after the death as well as before. *Cooper*, 561 N.W.2d at 180 (citing *Andrews*, 388 N.W.2d at 728–729). Circumstantial evidence used to form premeditation is entitled to the same weight as other evidence and will be sufficient to sustain a conviction as long as the circumstances proved are consistent with a hypothesis of guilt and inconsistent with any rational or reasonable hypothesis other than guilt. *See State v. Rhodes*, 657 N.W.2d 823, 840 (Minn.2003).

■ Our court has recognized three categories of evidence as relevant when inferring premeditation: planning activity, motive and the nature of the killing. *State v. Quick*, 659 N.W.2d 701, 710–11 (Minn. 2003) (citing *Moore*, 481 N.W.2d at 361). The first category, "planning activity," concerns itself with "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing * * *." *Moore*, 481 N.W.2d at 361 (quoting Wayne R. Lafave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 73 at 564–65 (1972)). Planning activity includes "prior possession of the murder weapon by the defendant, surreptitious approach of the victim, or taking the victim to a place where others are unlikely to intrude." *Id.; see, e.g., State v. Voorhees*, 596 N.W.2d 241, 247–48, 253 (Minn.1999) (stating that bringing rifle to estranged wife's place of work and quietly approaching her when she went outside to smoke supported inference of premeditation); *Moore*, 481 N.W.2d at 361–62 (concluding that removing shotgun from normal storage under the bed, loading it, and placing it on the shelf in the living room before the killing showed planning); *State v. Flores*, 418 N.W.2d 150, 158 (Minn.1988) (stating that retrieving gun between altercation with victim and shooting indicated planning).

In this case, there is no doubt that appellant procured a weapon prior to the shooting. Given the conflicting testimony of several witnesses and appellant, the state argues there are two different theories from which the jury could draw this conclusion. According to the first theory, appellant's girlfriend, Pajtshiab Ly, gave appellant a ride home at about 9:30 p.m. to get his mother's car to run errands. In keeping with this theory, appellant did not go home just to get his car, but also to procure a weapon, and then returned to the Club with a plan to kill Va. According to the state's second theory, and appellant's own testimony, appellant kept the gun in a wooded area by the Club and would retrieve it every time he was there, including the day in question.

Appellant argues that basing premeditation on the simple act of possession will sweep in much law-abiding behavior, and that therefore the second theory cannot stand. Specifically, he points to Minnesota's "conceal and carry" law, which allows individuals to possess firearms, and argues that such legal behavior should not be equated with premeditation.

Appellant's argument is unpersuasive. At trial, in addition to the evidence of appellant's possession of the gun, the jury heard evidence that appellant retrieved the gun from his home or from its hiding place at the Club, carried the gun, and that appellant approached Zoua for a ride after Va did, left his passenger car door open as he exited, shot Va, jumped back into the car and asked Zoua to take him away from the scene of the murder.

■ The second category of evidence relevant to show premeditation is "facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred." *Moore*, 481 N.W.2d at 361 (quoting Wayne R. Lafave & Austin W. Scott, Jr., *Handbook*

on *Criminal Law* § 73 at 564–65 (1972)). Motive evidence includes prior threats by the defendant to injure the victim, plans or desires of the defendant that would have been facilitated by the victim's death, and prior conduct by the victim known to have angered the defendant. *Id.; see, e.g., State v. Lodermeier,* 539 N.W.2d 396, 398 (Minn.1995) (stating that arguing with the victim the night before the killing, the deterioration of the defendant and victim's relationship, and being angry with victim indicate premeditation). "While proof of a motive is not a necessary element of premeditated murder, presence of a motive strengthens a finding that defendant deliberated over his actions and weakens the argument that the killing was spontaneous." *Moore,* 481 N.W.2d at 362.

On the night of the shooting, Va called his cousin Mary with an anxious tone, and asked her to come to get him. Further, as noted by the state, Va was in possession of fraudulent checks, as well as a list of names that included appellant and appellant's friend, Paul Her. Since Her had been taken to jail the previous day and members of the MABs allegedly had been upset with Va as a result, the jury may have believed that appellant was retaliating against Va for getting his friend into trouble. Finally, the fact that Va asked appellant to involve his other friends in the check forgery scheme immediately prior to the shooting, as testified to by appellant, may indicate that the conversation angered appellant further.

■■■ The third category of evidence suggesting premeditation is "facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *Moore,* 481 N.W.2d at 361 (quoting Wayne R. Lafave & Austin W. Scott, Jr., *Handbook on*

*Criminal Law* § 73 at 564–65 (1972)). In this category, we must examine the manner of the killing, usually by analyzing physical evidence. *Id.* We have recognized as relevant to this category of evidence the number of times the defendant used the weapon or the number of wounds inflicted and the period of time between infliction of the wounds. *See, e.g., Lodermeier,* 539 N.W.2d at 398; *Cooper,* 561 N.W.2d at 179.

As evidence of the premeditated "nature of the killing," the state points to the three wounds located on Va's back. Two of the wounds indicated that the shots came from close range and created steeply downward angled wound tracks. We have recognized that the placement of gunshot wounds can be indicators of premeditation. *Lodermeier,* 539 N.W.2d at 398 (stating that there was an indication of premeditation where two of the three shots inflicted fatal wounds, and both fatal wounds resulted from the gun having been fired at close range). Further, the state relies on Dr. McGee's testimony that given the location of the wounds, the wound tracks, and the rapid sequence of shots, the most reasonable explanation for the sequence of events was that Va was shot as he was turning and walking away from appellant, and falling to the ground after the initial shot. *See Cooper,* 561 N.W.2d at 180 (holding that the fact that a victim was about to leave after an exchange of just a few words and was then shot while moving away from the shooter was an indication of premeditation).

In addition to the direct testimony, an analysis of the totality of the circumstances suggests even more evidence of premeditation. Appellant shot Va multiple times at an extremely close range, and according to the physical evidence, did not stop shooting even when Va fell. Appellant then left the scene of the crime quickly after the shooting and told Zoua not to

tell anyone else what happened. The fact that appellant was more concerned with escape than with helping the victim, and that appellant appeared to have a plan of escape, may be used to infer premeditation. *Cooper*, 561 N.W.2d at 180; *Flores*, 418 N.W.2d at 158. Finally, appellant destroyed evidence of the crime by throwing the gun into a river after the shooting. *Flores*, 418 N.W.2d at 158 (stating that disposal of a gun after a shooting supports the inference that appellant was capable of premeditation at the time of the shooting).

Viewing the evidence in a light most favorable to the verdict, and acknowledging that the jury can choose to disbelieve evidence presented by appellant, the jury could reasonably conclude that premeditation was proven. While appellant and his witnesses offered a different fact scenario of what occurred, it was within the purview of the jury to evaluate the testimony and determine what witnesses were believable. We therefore hold the evidence is sufficient as a matter of law to prove beyond a reasonable doubt that appellant was guilty of premeditated first-degree murder.[10]

Affirmed.

---

**10.** Appellant also challenges the sufficiency of evidence supporting his conviction for drive-by shooting first-degree murder. Because appellant was never adjudicated guilty of the drive-by shooting first-degree murder and be-cause we hold the evidence sufficient to support a conviction of premeditated first-degree murder, it is unnecessary to address this issue.