**STATE of Minnesota, Respondent,**

v.

**Ryan Stanley HURD, Appellant.**

**No. A11–1057.**

Supreme Court of Minnesota.

Aug. 8, 2012.

---

Lori Swanson, Attorney General, James
B. Early, Assistant Attorney General, St.
Paul, MN; and Daniel A. McIntosh, Steele
County Attorney, Owatonna, MN, for re-
spondent.

David W. Merchant, Chief Appellate
Public Defender, Rochelle R. Winn, Assis-
tant State Public Defender, St. Paul, MN,
for appellant:

## OPINION

PAGE, Justice.

Appellant Ryan Stanley Hurd was indicted by a Steele County grand jury on one count of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2010); one count of first-degree murder while committing a kidnapping, Minn.Stat. § 609.185(a)(3) (2010); one count of second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2010); and two counts of second-degree felony murder, Minn. Stat. § 609.19, subd. 2(1), (2) (2010), in connection with the stabbing death of his girlfriend, Kathryn Anderson. A jury found Hurd guilty on all counts, and the trial court convicted Hurd of first-degree premeditated murder and sentenced him to life in prison without the possibility of parole. Hurd appeals his conviction and sentence, arguing that: (1) there was insufficient evidence to find him guilty of first-degree premeditated murder; (2) there was insufficient evidence to find him guilty of first-degree murder while committing a kidnapping; and (3) the trial court abused its discretion when it denied his request to instruct the jury that any confinement or removal that was incidental to the murder was insufficient to constitute kidnapping. For the reasons discussed below, we affirm Hurd's conviction for first-degree premeditated murder.

Hurd lived with Anderson in Anderson's apartment in Eagan. Anderson attended cooking school at Le Cordon Bleu. Hurd had a daughter with another woman. The daughter lived with her mother, but occasionally spent time with Hurd and Anderson. Because Anderson was only 18 years old when she moved out of her parents' home and was not old enough to sign her own lease, her parents rented and paid for her apartment. To reimburse her parents for rent, Anderson would send her parents checks drawn from student loan funds issued to her by Le Cordon Bleu to cover her living expenses. On December 1, 2009, Anderson went to the Le Cordon Bleu financial aid office to fill out a form requesting student loan funds. Hurd came with Anderson and stood by the doorway of the office. The financial aid director testified that Anderson usually stayed to chat when she came to the office, but on December 1, Anderson was "[d]efinitely not herself." The director further testified that Anderson "was very uncomfortable . . . kind of in a hurry or looking back."

The next morning, Anderson and Hurd were involved in an altercation in the school hallway. An instructor intervened, and Anderson was "really upset about that and really upset that other people saw." One of Anderson's classmates testified that Anderson "was visibly upset" during their noon cake-decorating class. Anderson commented that Hurd had been "meaner and meaner" and was becoming more aggressive toward her. A.B., a good friend and classmate of Anderson, testified that during class Anderson was frustrated and told A.B. that she and Hurd had been fighting. During class, and in the hour before class began, Anderson exchanged 28 text messages with Z.R., a man she had met on MySpace. Among other things, Anderson and Z.R. texted about meeting each other that weekend. Z.R. asked Anderson if she was still dating her boyfriend. Anderson replied that she was and indicated that meeting at her apartment was probably "not a good idea."

Also during that class, Anderson received numerous phone calls from Hurd. Anderson mentioned to her classmates that Hurd kept calling her and she was frustrated that he would not stop, even though he knew she was in class. Anderson's cell phone battery eventually died.

After class, Anderson went to Walmart with A.B. A.B. testified that Anderson came with her to the store because "[s]he didn't really want to deal with [Hurd]." Because her cell phone battery was dead and Hurd had her car, Anderson asked A.B. to call Hurd and tell him to pick up Anderson at Walmart. When A.B. called Hurd, who suffered from ulcers, Hurd told A.B. that he was in the hospital. A.B. then drove Anderson to the hospital and left her there.

Later that evening, Anderson called A.B. and told her that Hurd had left the hospital, that Anderson and Hurd had argued on the way home from the hospital, and that Anderson had stopped speaking to Hurd. Hurd had become angry, dropped Anderson off at her apartment, and then left in Anderson's car. Anderson told A.B. she would see A.B. the next day at school. Anderson also briefly exchanged text messages with the mother of Hurd's daughter, informing the child's mother for the first time that a scheduled weekend visit with the daughter was not going to take place. Meanwhile, Hurd went to a movie and was seen leaving the theater at around 9:20 p.m.

A neighbor who lived in the apartment directly below Anderson's apartment testified that on the night of December 2, between 9 and 10 p.m., she heard scuffling and arguing that lasted for about 10 minutes coming from Anderson's apartment. The neighbor heard a male voice say, "[f] * * k you, bitch." Cell phone records indicate that during that evening, nine calls were made to Hurd's mother from Hurd's cell phone. Two calls were also made to Hurd's mother from Anderson's cell phone. Hurd's mother testified that on the evening of December 2, she spoke with her son about the possibility that he would return home to Tulsa, Oklahoma. During at least one of their conversations, she also

heard Anderson in the background saying that Hurd was coming home.

Shortly after 6 a.m. on December 3, Hurd purchased a winter jacket and a prepaid cell phone from a Walmart in Bloomington, Minnesota. Around 6:30 a.m., Hurd, using the name "Mark Johnson," purchased a bus ticket to Tulsa, Oklahoma, at the Greyhound bus station in downtown Minneapolis.

Around 7 a.m. that morning, Anderson's body, dressed in only boxer shorts and a hooded sweatshirt, was found in a ditch along a gravel road near Owatonna. The location where the body was found was approximately 47 miles from Anderson's Eagan apartment, and almost 5 miles from the nearest exit from Interstate 35. The location was isolated and secluded with the nearest lights at least a quarter of a mile away. Witnesses testified that Anderson did not know anyone in Owatonna and was not known to have any reason to be in the area where her body was found.

When Anderson did not arrive for her noon class on December 3, A.B. texted and called Anderson's cell phone but received no response. A.B. called Hurd, who told her that he did not know where Anderson was. Hurd told A.B. that he had arrived home from a movie the night before and then had an argument with Anderson around 10:30 p.m. Shortly thereafter, Anderson "left with a guy." Hurd then packed his belongings to leave for Tulsa.

Having received no response from Anderson, A.B. went to Anderson's apartment, where she found the front door unlocked. There was testimony that it was Anderson's practice, whenever she left her apartment, to always take her wallet and keys with her, and to lock the door, unless Hurd was in the apartment. It was also Anderson's practice to take her cell phone with her wherever she went. Inside Anderson's apartment, A.B. found the tele-

vision on and the apartment messier than normal. A subsequent police search of the apartment found prepared, but uneaten, food on the stove and Anderson's cell phone in a drawer. Anderson's PlayStation gaming system was not in the apartment. A stamped envelope addressed to Anderson's parents, the kind she regularly used to send rent reimbursement checks to her parents, was found ripped open and empty, lying on the floor.

After visiting Anderson's apartment, A.B. spoke with Hurd several more times. During one of the conversations, Hurd changed his story about the events of the previous night and indicated that his argument with Anderson had lasted several hours before she left with a "guy." Hurd also asked A.B. during one of the conversations if she knew whether bus security personnel searched passenger belongings. Hurd told A.B. that he had taken Anderson's car and left it in the parking lot by the Greyhound station in Minneapolis. When A.B. asked where the keys to Anderson's car were, Hurd replied that he had taken his set of keys with him and that Anderson's keys were in her apartment. Because Anderson lived in a secure building, A.B. found it surprising that Anderson's key ring—including the keys to her car and her apartment—was still in her apartment, leaving Anderson with no way to access the building. In a later conversation, Hurd told A.B. that Anderson had been wearing a blue hooded sweatshirt and boxer shorts when he saw her leave the apartment the previous night.

After learning that Anderson was missing, Anderson's father called Hurd, who said he did not know where Anderson was. Hurd told Anderson's father that he had last seen Anderson around 2 a.m. the previous night when she had left her apartment, talked outside on her cell phone, and then was picked up by someone. When Anderson's father asked Hurd where Anderson's car was, Hurd replied that he had left it at a bus station, but could not remember which one.

*Police Investigation*

On December 4, 2009, the day after Anderson's body was discovered, medical examiner Dr. Lindsey Thomas performed an autopsy of Anderson's body. At the time of the autopsy, Anderson was wearing pajamas, consisting of a pair of boxer shorts, a tank-top, and a hooded sweatshirt. The autopsy revealed that Anderson had been stabbed 109 times. The stab wounds on Anderson's body were consistent with a single-edge knife blade, ranged from very superficial to just over 3 inches deep, and were associated with substantial blood loss. Several stab wounds nicked Anderson's ribs and punctured her lungs. One wound was associated with a chip in Anderson's skull and could have been inflicted with sufficient force to knock someone unconscious. Another, more superficial, wound was consistent with a slicing motion all the way across Anderson's neck. In addition to the stab wounds, Anderson had defensive wounds on her hands. Dr. Thomas observed that Anderson had multiple blunt-force abrasion injuries consistent with having been dragged across gravel in multiple directions. Other abrasion injuries on Anderson's legs were consistent with having been caused by the undercarriage of Anderson's vehicle.

Dr. Thomas concluded that Anderson's death was a homicide. Though none of the stab wounds would have been immediately incapacitating, Dr. Thomas determined that Anderson would have had a hard time walking due to a slit Achilles tendon and trouble breathing due to collapsed lungs. Dr. Thomas identified the cause of Anderson's death as a combination of

blood loss, an accumulation of blood and air associated with her punctured lungs, and possibly hypothermia.

Investigators found what was later determined to be Anderson's blood at eight separate places on both sides of the road at the location where Anderson's body was found, from approximately 140 feet west of her body to just east of her body. Investigators also found a single slipper belonging to Anderson on the side of the road 140 feet west of her body. The slipper was later determined to have both Anderson's and Hurd's blood on it. During the course of the investigation, the matching slipper was never found. Investigators also observed tire ruts on the shoulder of the road across from the ditch where Anderson's body was found and an additional, crescent-shaped rut on the shoulder of the road near Anderson's body.

As part of the investigation, a team from the Bureau of Criminal Apprehension (BCA) searched Anderson's car after it was recovered. Inside the car, investigators noticed that a reflector was broken out of the interior of the front passenger door. Investigators recovered Anderson's wallet and Hurd's cell phone battery from the console, Anderson's driver's license from the ashtray, and the back of Hurd's cell phone from the front passenger seat. Investigators also found Anderson's and Hurd's blood inside the car on the console, steering wheel, passenger seat back and headrest, and a portion of the driver's seat and sun visor. The blood found in the car's interior was not visible to the naked eye, which investigators testified was possibly due to the car's interior having been cleaned.

Examining the exterior of the car, investigators found Anderson's blood on the passenger side of the hood and windshield, on the passenger-side wheel well, on the driver's-side front tire, and on various oth-

er parts of the car. The pattern of blood on the tire and wheel well indicated that the car was turning as it was driven through blood. Additionally, investigators found impact blood splatters on the car's hood and front bumper. The splatters indicated that a bleeding body had impacted the car and/or that someone had been stabbed beside the vehicle. On the undercarriage of the car, investigators discovered a small piece of unidentified material containing Anderson's DNA.

*Hurd's Arrest*

On December 4, Hurd talked to a BCA agent about his activities on December 2. According to Hurd, he went to the movies and, when he returned to Anderson's apartment, he and Anderson argued until midnight or later. Hurd explained that they had argued because Anderson had made plans with other people for the upcoming weekend, even though Hurd's daughter was supposed to stay with the two of them. Hurd said that after they argued, Anderson left the apartment wearing shorts and a hooded sweatshirt after talking with someone on her cell phone. Hurd indicated that it sounded to him as if Anderson got into a car with someone, though Hurd never saw a vehicle. Hurd told the agent that he later drove around Minneapolis and St. Paul looking for Anderson while calling her cell phone repeatedly, a fact contradicted by cell phone records that revealed that Hurd's cell phone made no outgoing calls between 11 p.m. and 6 a.m. that night, except to check voicemail. After searching for Anderson, Hurd said that he took her car to the bus station and left Anderson a message telling her where he left the car. Later in the interview, Hurd suggested that Anderson may have been picked up by a man named "Tre," whom Anderson may have met on MySpace. Hurd indicated that Anderson talked with many men on MySpace.

Later in the day, on December 4, police arrested Hurd at his mother's home in Tulsa. At the time of his arrest, Hurd was in possession of a pocketknife with a single-edge, 3–inch blade, $240 in cash, a Walmart receipt, two cell phones, and a bus ticket bearing the name "Mark Johnson." Police also found a PlayStation game console in Hurd's luggage. Investigators sent clothing and other items seized at the time of Hurd's arrest to Minnesota for forensic testing. The knife in Hurd's possession was found to have Anderson's blood on it, as did an article of Hurd's clothing. The bloodstains on Hurd's clothing had been diluted, suggesting the item had been washed.

While in jail in Tulsa, Hurd wrote a number of incriminating statements on the walls of his cell, including: "It was a mistake what happened to Katie"; "God forgive my sins"; "Only God can judge me"; "Shoulda been me"; "I did it"; "Never should have lost control"; "Sorry, Katie"; "When I killed[ ]her[,] I killed me, so in a way, a community accident"; "Katie, forgive me and Lord watch over me"; and "Why I killed her? [It] was an honest mistake that went too far." Hurd's mother also testified that Hurd admitted to her that, on the evening of December 2, Anderson had been in her car with Hurd and that they had planned to drive to the bus station. At some point during the trip, Anderson began kicking and hitting Hurd, supposedly because he began driving to Tulsa and would not turn around.

At trial, the defense conceded that Hurd had intentionally killed Anderson, but argued that he did not kidnap Anderson or premeditate the killing. The jury found Hurd guilty of each of the charged offenses and the trial court sentenced Hurd to life in prison without the possibility of parole for first-degree premeditated murder. This direct appeal followed.

■ We begin by addressing Hurd's argument that the evidence presented at trial was insufficient to support his first-degree premeditated murder conviction. Specifically, Hurd argues that the circumstantial evidence presented by the State to prove premeditation did not unerringly point to his guilt and was therefore insufficient as a matter of law to convict him of first-degree premeditated murder.

■ When reviewing the sufficiency of the evidence we "must determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to allow a jury to reach a guilty verdict." *State v. Fleck,* 777 N.W.2d 233, 236 (Minn.2010). In making this determination, we "assume that the factfinder disbelieved any testimony conflicting with that verdict." *State v. Leake,* 699 N.W.2d 312, 319 (Minn.2005). As the fact finder, "[t]he jury is in the best position to weigh credibility and thus determines which witnesses to believe and how much weight to give their testimony." *Fleck,* 777 N.W.2d at 236. Therefore, we will not overturn a guilty verdict "if, giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense." *Leake,* 699 N.W.2d at 319.

■ We review convictions based on circumstantial evidence with "particular scrutiny." *State v. Bolstad,* 686 N.W.2d 531, 539 (Minn.2004). We apply a two-step analysis to determine whether the circumstantial evidence is sufficient to sustain a guilty verdict. *See State v. Andersen,* 784 N.W.2d 320, 329–30 (Minn.2010). First, we "identify the circumstances proved, giving deference 'to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflict-

ed with the circumstances proved by the State.'" *State v. Anderson,* 789 N.W.2d 227, 241–42 (Minn.2010) (quoting *Andersen,* 784 N.W.2d at 329). Next, "we independently examine 'the reasonableness of all inferences that might be drawn from the circumstances proved,' including inferences consistent with a hypothesis other than guilt." *Id.* at 242 (quoting *Andersen,* 784 N.W.2d at 329); *see also State v. Al–Naseer,* 788 N.W.2d 469, 473–74 (Minn. 2010). Under this second step, we must "determine whether the circumstances proved are 'consistent with guilt and inconsistent with any rational hypothesis except that of guilt,' not simply whether the inferences that point to guilt are reasonable." *State v. Palmer,* 803 N.W.2d 727, 733 (Minn.2011) (quoting *Andersen,* 784 N.W.2d at 330). In the first step of our analysis, "we defer to the factfinder [but] for the second step, we engage in our own examination of the reasonableness of the inferences." *Id.; see also State v. Stein,* 776 N.W.2d 709, 716 (Minn.2010) (plurality opinion) ("In assessing the inferences drawn from the circumstances proved, the inquiry is not simply whether the inferences leading to guilt are reasonable. Although that must be true in order to convict, it must also be true that there are no other reasonable, rational inferences that are inconsistent with guilt."). Additionally, we view the circumstantial evidence as a whole, not as isolated facts. *See Andersen,* 784 N.W.2d at 332.

 To be guilty of first-degree premeditated murder, an individual must have caused "the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn. Stat. § 609.185(a)(1) (2010). "Premeditation" means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2010). "Premeditation is a

state of mind generally proved circumstantially by drawing inferences from a defendant's words and actions in light of the totality of the circumstances." *State v. Brocks,* 587 N.W.2d 37, 42 (Minn.1998). Premeditation does not require "'proof of extensive planning or preparation to kill.'" *State v. Hughes,* 749 N.W.2d 307, 312 (Minn.2008) (quoting *State v. Cooper,* 561 N.W.2d 175, 180 (Minn.1997)). But to prove premeditation, the State must show that, "after the defendant formed the intent to kill, some appreciable time passed during which the consideration, planning, preparation or determination required by Minn.Stat. § 609.18 prior to the commission of the act took place." *State v. Moore,* 481 N.W.2d 355, 361 (Minn.1992).

 In determining whether there is sufficient evidence of premeditation, we examine the evidence as a whole. *See Palmer,* 803 N.W.2d at 733. The totality of the evidence "may support a finding of premeditation even if no single piece of evidence standing alone would be sufficient. What is required is that the circumstances lead so directly to a finding of premeditation as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt of premeditated murder." *Moore,* 481 N.W.2d at 361. The totality of the circumstances includes events after the death as well as before. *Cooper,* 561 N.W.2d at 180. We have recognized three categories of evidence that are relevant to an inference of premeditation—planning activity, motive, and the nature of the killing—and address each in turn. *See, e.g., Hughes,* 749 N.W.2d at 313. Here, the only reasonable inference to be drawn from the circumstances proved related to planning activity, motive, and the nature of the killing is that Hurd premeditated Anderson's killing.

*Planning Activity*

Planning activity consists of " 'facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing.' " *Hughes,* 749 N.W.2d at 313 (quoting *Moore,* 481 N.W.2d at 361). Planning activity may include " 'prior possession of the murder weapon, surreptitious approach of the victim, or taking the prospective victim to a place where others are unlikely to intrude.' " *Moore,* 481 N.W.2d at 361 (quoting Wayne R. LaFave & Austin W. Scott Jr., *Handbook on Criminal Law* § 73, at 564–65 (1972)); *see State v. Voorhees,* 596 N.W.2d 241, 253 (Minn. 1999) (finding premeditation when the defendant followed the victim to a place where he knew she would be alone before shooting her); *State v. Martin,* 261 N.W.2d 341, 345 (Minn.1977) (finding evidence of premeditation when the defendant drove the victim to a secluded area before killing her). We have also held that a defendant's "cool, calm demeanor" in attempting to avoid detection and destroying evidence is consistent with a finding of premeditation. *State v. Kendell,* 723 N.W.2d 597, 606 (Minn.2006); *Leake,* 699 N.W.2d at 321 (finding premeditation where a defendant disposed of evidence after a murder "by putting it in garbage bags and burning it in a fire").

The circumstances proved in this case related to planning activity include: (1) Hurd brought the murder weapon, a knife, with him when he drove Anderson to Owatonna; (2) Hurd took Anderson 47 miles away from her apartment against her will; (3) Hurd took Anderson 5 miles from the nearest freeway exit; (4) the nearest lights were over a quarter of a mile away; (5) the area was isolated and secluded; (6) the murder occurred late at night; (7) after beating and stabbing Anderson, Hurd left her in a ditch on the side of the road; (8)

Hurd left Anderson on a cold December night wearing only a sweatshirt, boxer shorts, and no shoes; (9) after the murder Hurd bought a jacket and a prepaid phone at Walmart; (10) Hurd then bought a bus ticket to Tulsa using an assumed name; (11) Hurd had previously told his mother that he planned to return home to Tulsa; (12) Hurd lied to A.B. about the last time he saw Anderson in an effort to avoid detection; (13) Hurd lied to Anderson's father to avoid detection; (14) Hurd lied to a BCA agent to avoid detection; (15) Hurd washed his bloody clothes; (16) Hurd attempted to clean the blood from Anderson's car before abandoning it at the bus station; and (17) Hurd took money and a PlayStation game console from Anderson's apartment. The inferences to be drawn from these circumstances relating to planning activity, when viewed as a whole, are consistent with the jury's finding of premeditation and inconsistent with any rational hypothesis other than guilt.

*Motive*

Motive evidence is unnecessary to a finding of premeditation, but if motive is present, "it can help strengthen a finding that the defendant deliberated about the killing." *Anderson,* 789 N.W.2d at 242. Motive evidence can include "prior threats by the defendant to injure the victim," *State v. Moua,* 678 N.W.2d 29, 41 (Minn.2004), and " 'prior conduct of the victim known to have angered the defendant,' " *Hughes,* 749 N.W.2d at 314 (quoting *Moore,* 481 N.W.2d at 361). We have also found motive evidence supporting a finding of premeditation when there is "evidence that defendant's relationship with the victim had deteriorated and that defendant was angry with [the victim,]" including "evidence that defendant and the victim had argued the night before the killing." *State v. Lodermeier,* 539 N.W.2d 396, 398 (Minn.1995); *see also State v.*

*Pendleton,* 759 N.W.2d 900, 910 (Minn. 2009) (finding the evidence sufficient to support a finding of premeditation in part because motive evidence showed the defendant and victim had fought on the night of the killing and "had a rocky relationship prior to that night").

The circumstances proved in this case related to motive include: (1) Anderson and Hurd had an altercation at her school on the morning of the day she was killed; (2) later that day, Anderson and Hurd argued in the car while returning from the hospital; (3) a neighbor heard arguing and scuffling coming from Anderson's apartment on the night of the murder; (4) Hurd was angry with Anderson because she had made plans that resulted in cancelation of a scheduled visit with his daughter; (5) Hurd was jealous of Anderson's communication with other men via MySpace; (6) Hurd was likely unemployed; (7) Hurd took money and a video gaming system from Anderson's apartment; and (8) in the days leading up to the murder, Hurd was becoming "meaner and meaner" and more aggressive towards Anderson. The reasonable inferences to be drawn from the motive evidence in this case, viewed as a whole, are consistent with premeditation and inconsistent with a lack of premeditation.

*The Nature of the Killing*

▮▮▮▮▮▮ With respect to the nature of the killing, we examine " 'facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.' " *Moore,* 481 N.W.2d at 361 (quoting LaFave & Scott, *supra,* § 73, at 564–65). In doing so, we have looked to "the number of times the defendant used the weapon or the number of wounds inflicted and the period of time between infliction of the wounds." *Moua,*

678 N.W.2d at 41. Evidence of a particularly brutal killing and "a long and severe attack" may be enough to prove premeditation. *Cooper,* 561 N.W.2d at 180; *see State v. Fort,* 768 N.W.2d 335, 343–44 (Minn.2009) (finding sufficient evidence of premeditation when the victim had been "stabbed 44 times in a particularly brutal manner," "the stabbing took place in three areas of the house and involved multiple blows to vital locations," and the forensic evidence indicated "that the attack occurred over a long period of time"); *Pendleton,* 759 N.W.2d at 910 (finding premeditation when the defendant transported the victim to a river, stabbed the victim 15 times, and threw the victim in the river); *Martin,* 261 N.W.2d at 345 (finding evidence of premeditation based on "the extreme brutality of the killing," including "the continued stabbing over a period of time"). Evidence that the defendant chased the victim also supports a finding of premeditation. *See State v. Vang,* 774 N.W.2d 566, 583 (Minn.2009); *State v. Holliday,* 745 N.W.2d 556, 564 (Minn.2008). Moreover, making the decision to leave a victim with no means to seek the help necessary to prevent the victim's death is sufficient to support a finding of premeditation. *See State v. McArthur,* 730 N.W.2d 44, 50 (Minn.2007) (explaining that evidence of premeditation includes "a defendant's concern with escape rather than with rendering aid to the victim"); *Moua,* 678 N.W.2d at 42 (finding that "[t]he fact that appellant was more concerned with escape than with helping the victim, and that appellant appeared to have a plan of escape, may be used to infer premeditation"); *Voorhees,* 596 N.W.2d at 253 (finding sufficient evidence of premeditation in part because the defendant left the victim "lying on the ground to die" while waiting 2 hours before calling 911); *State v. Thomas,* 590 N.W.2d 755, 758 (Minn.1999) (finding sufficient evidence of premeditation

when the victim died of dehydration because the defendant "made a conscious decision to lock the door to the apartment" with the 14–month–old victim inside).

In this case, the circumstances proved related to the nature of the killing include: (1) Hurd stabbed Anderson 109 times; (2) the attack took place over a long period of time; (3) the killing was particularly brutal; (4) Anderson suffered punctured lungs, impairing her ability to breathe; (5) Anderson suffered a chip to her skull; (6) some of the stab wounds were deep and associated with substantial blood loss; (7) Anderson's Achilles tendon was slit, causing her to be unable to walk; (8) the attack occurred both inside and outside of the car; (9) Hurd likely pursued Anderson with the car, ran over her with the car, or used the car to push her into the ditch; (10) Hurd abandoned Anderson in a ditch on a cold December night; (11) Anderson was left 5 miles from the nearest freeway exit and a quarter of a mile away from any inhabited area; (12) Anderson was wearing only boxer shorts and a sweatshirt and was not wearing any shoes; and (13) Anderson was without a cell phone or other means to seek help for herself. The only reasonable inference to be drawn from the circumstances proved relating to the nature of Anderson's killing, viewed as a whole, is that Hurd premeditated the killing.

Given the evidence of Hurd's planning activity, his motive, and the nature of Anderson's killing, and given the reasonable inferences to be drawn from that evidence, we conclude that the evidence of premeditation was sufficient to support Hurd's first-degree premeditated murder conviction.[1]

Affirmed.

---

1. We do not reach Hurd's remaining arguments regarding first-degree murder while committing a kidnapping because we conclude, based on review of the sentencing transcript and the warrant of commitment, that the trial court convicted Hurd only of first-degree premeditated murder. *See Moua,* 678 N.W.2d at 42 n. 10 (declining to address appellant's arguments regarding an offense for which he was never convicted after affirming the appellant's conviction for first-degree premeditated murder).