*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1275**

State of Minnesota,
Respondent,

vs.

James Michael Soderbeck,
Appellant.

**Filed June 22, 2015
Affirmed
Larkin, Judge**

Ramsey County District Court
File No. 62-CR-13-8317

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Larkin, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his convictions of possession of a firearm by an ineligible person and terroristic threats, arguing that the evidence is insufficient to sustain the possession conviction and that a series of evidentiary errors resulted in an unfair trial. We affirm.

**FACTS**

Respondent State of Minnesota charged appellant James Michael Soderbeck with possession of a firearm by an ineligible person and two counts of terroristic threats. The complaint alleged that Soderbeck threatened to kill his mother, D.S., and his nephew, A.S., who is D.S.'s grandson. The complaint also alleged that D.S. found a loaded shotgun in Soderbeck's closet. The case was tried to a jury.

At trial, D.S. testified that Soderbeck and A.S. lived in her home in October 2013. On October 29 at 2:00 a.m., D.S. woke up and discovered Soderbeck and two of his friends smoking "crap" at her kitchen table. She kicked them out of the house. Soderbeck returned around 11:30 a.m. He slammed the door and appeared agitated. He told D.S. that he wanted to kill her. D.S. testified that she responded: "Good, go for it. Then I don't have to deal with you anymore." Less than a half hour later, Soderbeck again told D.S. that he wanted to kill her or murder her. He turned to A.S. and said the same thing. D.S. testified that at this point she "was in fear of my life and my grandson's life." She and A.S. left the house.

D.S. testified that she called the police and that "it's always me calling the police." When the prosecutor asked why she called the police, D.S. stated: "Because I wanted him out of my home. I was tired of being threatened and tired of him threatening people and doing whatever he wants to do."

D.S. testified that she returned to her house after Soderbeck had left. She turned on the light in Soderbeck's bedroom and saw a 12-gauge shotgun in a case sitting in the corner of his bedroom closet. D.S. confirmed that the shotgun was in Soderbeck's bedroom and that no one shared the bedroom with Soderbeck. D.S. testified that she carried the shotgun downstairs, put it on the kitchen table, and asked other family members to "get rid of it." After no one volunteered to remove the shotgun, D.S. called the police to remove it.

D.S. testified that two or three months earlier, she saw one of Soderbeck's friends playing with the shotgun in her house and she asked Soderbeck to remove the gun from the house. She also testified that she previously found the shotgun in a hallway closet and moved it to her bedroom closet and that she did not see the gun again until she found it in Soderbeck's closet on October 29. D.S. testified that she believed the gun belonged to Soderbeck's 14-year-old son who lived in Wisconsin and that his son had visited her house approximately a week before October 29. D.S. testified that she never actually saw Soderbeck with the shotgun.

A.S. testified that on October 29, he woke up in the morning and heard Soderbeck yelling and screaming. When A.S. walked downstairs, Soderbeck looked at him and said: "I'm going to kill ya." A.S. testified that Soderbeck then turned to D.S. and said:

"I'm going to kill both of you." A.S. testified that Soderbeck's comments surprised him and "kind of got [him] scared."

Soderbeck's sister, D.A., testified that she went to D.S.'s residence the afternoon of October 29 to speak with Soderbeck. Soderbeck was asleep in his bedroom. After he woke up, D.A. spoke with him. Soderbeck told D.A. that he did not remember the incident with D.S. and A.S.

Saint Paul Police Officer Mark Nelson testified that around 10:00 p.m. on October 29, he responded to a call with his K-9 partner to assist officers who were attempting to arrest Soderbeck at D.S.'s residence. He searched the house and yelled over ten times: "Police K-9. Surrender to the sound of my voice or my dog will bite you." Officer Nelson testified that he had a "reasonable belief" that Soderbeck might still have a firearm and that Soderbeck was hiding and had a clear "tactical advantage." Officer Nelson also testified that he was "very concerned" for his safety. Officer Nelson's K-9 partner eventually apprehended Soderbeck in a dark room in the basement of the house.

Sergeant William Haider testified that he interviewed Soderbeck in jail after his arrest, that he asked Soderbeck to voluntarily consent to a DNA test, and that Soderbeck "angrily refused." Sergeant Haider obtained a search warrant and took a DNA sample from Soderbeck. Sergeant Haider also testified that Soderbeck told him that "if he had f--king threatened f--king somebody, somebody would have been dead" and that Soderbeck also said: "Because I would have pulled the trigger if I had a gun, along with your f--king boys."

4

A forensic scientist from the Minnesota Bureau of Criminal Apprehension testified that she conducted DNA testing on swabs taken from the grip and stock of the shotgun, and that the swabs contained a mixture of DNA from three or more individuals. Soderbeck could not be excluded as a contributor to the mixture, but 99.7% of the population could be excluded. Samples taken from the shotgun's trigger and bolt action contained a DNA mixture from two or more individuals. Soderbeck could not be excluded as a contributor, but 99.991% of the population could be excluded. Soderbeck was excluded as a contributor to a DNA mixture found on the barrel of the shotgun. But Soderbeck could not be excluded as a contributor to a DNA mixture found on samples from the shotshell holder. The forensic scientist testified that people can shed their DNA, that DNA can transfer from one object to another, and that DNA can last for years. The forensic scientist could not say how the DNA got on the shotgun or how long it had been there.

During deliberations, the jury sent a note to the district court asking: "We are not able to agree on one count, possession firearm. What are we to do from here?" The district court told the jury to continue deliberating. The jury presented a second question to the district court: "For possession of the gun, does it matter if he knew where the gun was on 10/29 or had any idea the gun was in the house at any time?" The district court told the jury to refer to the original jury instructions. The jury returned to its deliberations and later found Soderbeck guilty as charged. Soderbeck appeals.

**I.**

Soderbeck argues that the evidence that he constructively possessed the shotgun is insufficient to sustain his conviction because the circumstances proved do not eliminate all rational hypotheses other than guilt.

When reviewing a jury verdict, an appellate court considers whether the legitimate inferences drawn from the evidence would permit a jury to conclude that the defendant was guilty beyond a reasonable doubt. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). Review is limited to a close analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jury to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). The reviewing court must assume "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). The reviewing court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

The parties argue that the evidence establishing constructive possession in this case is circumstantial.[1] An appellate court applies heightened scrutiny when reviewing a

---

[1] We structure our analysis in accordance with the parties' arguments. But we note that neither party discussed *State v. Salyers*, a recent case in which the supreme court questioned "whether the heightened circumstantial-evidence standard of review applies to a challenge to the sufficiency of the evidence of constructive possession." 858 N.W.2d

verdict based on circumstantial evidence. *Pratt*, 813 N.W.2d at 874. The circumstances proved must be consistent with guilt and inconsistent with any other rational hypothesis. *Id.* Minnesota courts employ a two-step process when reviewing convictions based on circumstantial evidence. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010). First, the reviewing court identifies the circumstances proved. *Id.* In doing so, the court views the evidence in the light most favorable to the verdict. *See Pratt*, 813 N.W.2d at 874 (stating that the supreme court had considered the evidence "in the light most favorable to the verdict" when determining the circumstances proved). The court defers to the fact-finder's acceptance and rejection of proof and to its credibility determinations. *Andersen*, 784 N.W.2d at 329; *see also State v. Hughes*, 749 N.W.2d 307, 312 (Minn. 2008) (stating that juries are "in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony").

Next, the reviewing court examines the reasonableness of the inferences that can be drawn from the circumstances proved, including inferences of innocence as well as guilt. *Andersen*, 784 N.W.2d at 329. All of the circumstances proved must be consistent with guilt and inconsistent with any other rational hypothesis negating guilt. *Id.* The reviewing court does not defer to the fact-finder's choice between rational hypotheses. *Id.* at 329-30. But appellate courts "view the circumstantial evidence as a whole, not as isolated facts." *State v. Hurd*, 819 N.W.2d 591, 599 (Minn. 2012). And the "[s]tate does not have the burden of removing all doubt, but of removing all reasonable doubt." *State*

156, 158 (Minn. 2015). The supreme court ultimately did not decide when the circumstantial-evidence standard of review should be applied to sufficiency challenges in constructive-possession cases. *Id.* at 161 n.4.

7

*v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). A rational hypothesis negating guilt must be based on more than mere conjecture or speculation. *Id.* at 480; *Andersen*, 784 N.W.2d at 330.

"Possession of a firearm may be proved through actual or constructive possession." *Salyers*, 858 N.W.2d at 159.

> The purpose of the constructive-possession doctrine is to include within the possession statute those cases where the state cannot prove actual or physical possession at the time of arrest but where the inference is strong that the defendant at one time physically possessed [an item] and did not abandon his possessory interest in the [item] but rather continued to exercise dominion and control over it up to the time of the arrest.

*State v. Florine*, 303 Minn. 103, 104-05, 226 N.W.2d 609, 610 (1975). To prove constructive possession under the *Florine* test, "the [s]tate must show either (1) that the prohibited item was found 'in a place under defendant's exclusive control to which other people did not normally have access,' or (2) if the prohibited item was found 'in a place to which others had access, there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over it.'" *Salyers*, 858 N.W.2d at 159 (quoting *Florine*, 303 Minn. at 105, 226 N.W.2d at 611).

In this case, the evidence suggests that the shotgun was found in a place that was not under Soderbeck's exclusive control and to which other people had access. Thus, the state had to prove, under the second prong of the *Florine* test, a "strong probability" that Soderbeck was "consciously exercising dominion and control" over the shotgun. *See Florine*, 303 Minn. at 105, 226 N.W.2d at 611. The circumstances proved include that on

8

October 29, D.S. found a shotgun in a closet in Soderbeck's bedroom, a room that he did not share with anyone else. Soderbeck's DNA was on the samples taken from the shotgun's grip and stock, trigger and bolt action, and shotshell holder. These circumstances support a rational hypothesis that Soderbeck was consciously exercising dominion and control over the shotgun. *See State v. Denison*, 607 N.W.2d 796, 800 (Minn. App. 2000) (concluding that the evidence was sufficient to prove constructive possession where, among other evidence, "[s]ome of the marijuana was located in a closet where Ms. Denison kept her clothing"), *review denied* (Minn. June 13, 2000).

Soderbeck argues that "the circumstances proved do not eliminate the rational hypothesis that someone else placed the gun in Soderbeck's closet without his knowledge and that his DNA could not be excluded from the DNA on the gun because he had either touched it as some [earlier] point or because his DNA was transferred onto it." He points to trial evidence suggesting that others had access to his bedroom because it did not have a lock, his bedroom closet did not have a door, other family members had been upstairs that day, his friends had been there during the early morning hours, and his son, the owner of the gun, had been there one week earlier. He also points out that D.A. testified that the closet belonged to Soderbeck and D.S.

Soderbeck does not identify record evidence from which it rationally can be inferred that someone else placed the shotgun in his closet without his knowledge. The evidence on which he relies simply shows that there were opportunities for someone else to do so. Nor does Soderbeck identify record evidence showing that his DNA was

transferred to the gun from another object. Soderbeck merely argues that it was a possibility. Soderbeck's hypotheses of innocence therefore are based on conjecture or speculation and are unreasonable in light of the evidence as a whole. *See Al-Naseer*, 788 N.W.2d at 480 ("[A] defendant is not relying on conjecture or speculation when the defendant . . . points to evidence in the record that is consistent with a rational theory other than guilt." (quotation omitted)); *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002) ("[P]ossibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." (quotation omitted)). Because the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that Soderbeck constructively possessed the shotgun, we do not disturb the verdict.

## II.

Soderbeck argues that several evidentiary errors made his trial unfair. He therefore requests reversal and remand for a new trial. *See State v. Jackson*, 714 N.W.2d 681, 698 (Minn. 2006) ("An appellant is entitled to a new trial if . . . errors, when taken cumulatively, had the effect of denying appellant a fair trial." (quotation omitted)).

"Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the trial court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted). An erroneous "evidentiary ruling will not be reversed unless the error substantially influenced the jury's verdict." *State v. Carridine*, 812 N.W.2d 130, 141 (Minn. 2012).

Generally, an issue will not be considered if raised for the first time on appeal. *State v. Anderson*, 733 N.W.2d 128, 134 (Minn. 2007). Nevertheless, an appellate court may review an issue not raised in the district court if there was plain error affecting substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). Under this standard, we consider (1) whether there was an error, (2) whether such error was plain, and (3) whether it affected the defendant's substantial rights. *Id.* An error is plain if it is "clear" or "obvious." *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002) (quotation omitted). "Usually this is shown if the error contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). "The third prong, requiring that the error affect substantial rights, is satisfied if the error was prejudicial and affected the outcome of the case." *Griller*, 583 N.W.2d at 741. The defendant bears the burden of persuasion on the third prong, and it is a "heavy burden." *Id.* "If a defendant fails to establish that the claimed error affected his substantial rights, [appellate courts] need not consider the other [plain-error] factors." *State v. Goelz*, 743 N.W.2d 249, 258 (Minn. 2007). If the three plain-error factors are established, this court considers whether the error seriously affected the fairness and integrity of the judicial proceedings. *See Griller*, 583 N.W.2d at 740, 742 (explaining that a court may exercise its discretion to correct a plain error only if such error seriously affected fairness, integrity, or public reputation of judicial proceedings).

*Search of the Home*

Soderbeck contends that the district court erred by allowing Officer Nelson to testify about the search that preceded Soderbeck's arrest. Because Soderbeck objected to

11

this evidence at trial, we review the district court's ruling for an abuse of discretion. *Amos*, 658 N.W.2d at 203.

Soderbeck argues that the testimony regarding Officer Nelson's search was irrelevant—including testimony regarding Officer Nelson's ten shouts for Soderbeck to surrender, his belief that Soderbeck might still have a firearm, his feeling that Soderbeck had a clear tactical advantage, his concern for his safety, and the fact that Soderbeck was hiding. Soderbeck also argues that even if this evidence had "some minimal probative value, any such value was outweighed by the dangers of unfair prejudice to [him]."

"Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. "All relevant evidence is admissible, except as otherwise provided by the United States Constitution, the State Constitution, statute, by these rules, or by other rules applicable in the courts of this state. Evidence which is not relevant is not admissible." Minn. R. Evid. 402.

Evidence that Soderbeck hid from the police and regarding the effort it took to find him was relevant to show consciousness of guilt. The district court did not err in admitting this evidence. *See State v. Givens*, 356 N.W.2d 58, 63 (Minn. App. 1984) ("Flight evidence is admissible on the issue of consciousness of guilt." (quotation omitted)), *review denied* (Minn. Jan. 2, 1985). On the other hand, Officer Nelson's testimony regarding his concern for his safety was not relevant, and its admission was error. However, the error is not grounds for reversal unless it "substantially influenced the jury's verdict." *Carridine*, 812 N.W.2d at 141.

12

Soderbeck argues that evidence regarding Officer Nelson's safety concern "amounted to an unfair and illegitimate attack of [his] character because it led the jury to believe that [he] was so dangerous that he could cause an armed police officer . . . to fear for his safety." But Officer Nelson explained that his safety concern was based on the crimes under investigation: he testified that he knew Soderbeck "was wanted for terroristic threats and possession of a firearm." Given Officer Nelson's explanation, we conclude that the evidence did not substantially influence the jury's verdict. Thus, although evidence regarding Officer Nelson's concern for his safety was erroneously admitted, it does not warrant reversal.

*Evidence that the Shotgun was Loaded*

Soderbeck contends that the district court erred by "repeatedly admitting evidence that the gun was loaded and had to be made safe." Because Soderbeck did not object to this evidence, we review for plain error. *Griller*, 583 N.W.2d at 740.

Two police officers who responded to D.S.'s call testified that they examined the shotgun and that it was loaded. Soderbeck argues that admission of this testimony was error that was plain error because the testimony was irrelevant and contravened caselaw holding that the operability of the firearm is not an element that the state has to prove. But Soderbeck does not explain how admission of this testimony affected his substantial rights. The defendant bears the burden of persuasion on the third prong of the plain-error test and it is a "heavy burden." *Id.* at 741. Because Soderbeck has not met this burden, we conclude that he is not entitled to relief under the plain-error standard. *See Goelz*, 743

13

N.W.2d at 258 ("If a defendant fails to establish that the claimed error affected his substantial rights, [appellate courts] need not consider the other [plain-error] factors.").

*Refusal to Voluntarily Submit to DNA Testing*

Soderbeck contends that the district court erred by admitting evidence that he refused to voluntarily give his DNA to the police for testing and that the police had to obtain a warrant. Because Soderbeck did not object to this testimony, we review for plain error. *Griller*, 583 N.W.2d at 740.

Admission of this evidence was error that was plain. A suspect has "the right to require a warrant before providing a sample of his DNA." *State v. Jones*, 753 N.W.2d 677, 687 (Minn. 2008). "It is a violation of the defendant's right to due process for a prosecutor to comment on a defendant's failure to consent to a warrantless search." *Id.* And it is "improper for the prosecutor to present direct evidence that [a defendant] failed to consent to a search." *Id.* (emphasis omitted).

Soderbeck argues that this evidence was "highly prejudicial because the jury was not told that [he] had the right to require a warrant" and "unfairly implied to the jury that [he] refused to give a DNA sample because of his guilt." But the third prong of the plain-error test requires a showing that the error was prejudicial *and* that the error "affected the outcome of the case." *Griller*, 583 N.W.2d at 741. Soderbeck does not argue that the error affected the outcome of the case. Because Soderbeck has not met his burden, we conclude that he is not entitled to relief under the plain-error standard.

14

*Other Bad-Acts Evidence*

Soderbeck contends that the district court erred by admitting testimony from Sergeant Haider that D.S. told him that Soderbeck often threatened to punch her and testimony from D.S. that she was tired of being threatened, that she was tired of Soderbeck threatening people, and that it was "always" her calling the police on Soderbeck.  Soderbeck objected to Sergeant Haider's testimony, but did not object to D.S.'s testimony.  We therefore review the admission of Sergeant Haider's testimony for an abuse of discretion and the admission of D.S.'s testimony for plain error.  *See Amos*, 658 N.W.2d at 203; *Griller*, 583 N.W.2d at 740.

On this issue, Soderbeck's only argument is that Haider's and D.S.'s testimony was evidence regarding other bad acts, which is inadmissible under Minn. R. Evid. 404(b).  However, the evidence was admissible under Minn. Stat. § 634.20 (Supp. 2013), which provides that

> [e]vidence of domestic conduct by the accused against the victim of domestic conduct, or against other family or household members, is admissible unless the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

This so-called "[r]elationship evidence is relevant because it illuminates the history of the relationship between the victim and defendant and may also help prove motive or assist the jury in assessing witness credibility."  *State v. Matthews*, 779 N.W.2d 543, 549 (Minn. 2010) (quotation omitted).

15

Relationship evidence is treated differently than other "collateral" evidence, partly because "[d]omestic abuse is unique in that it typically occurs in the privacy of the home, it frequently involves a pattern of activity that may escalate over time, and it is often underreported." *State v. McCoy*, 682 N.W.2d 153, 161 (Minn. 2004). Thus, the stringent procedural requirements of Minn. R. Evid. 404(b) do not apply to relationship evidence admitted under section 634.20. *State v. Meyer*, 749 N.W.2d 844, 849 (Minn. App. 2008). Section 634.20 "specifically provides for the admission of evidence of 'similar conduct' by the accused unless it fails to meet a balancing test that considers whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *McCoy*, 682 N.W.2d at 159.[2] For purposes of section 634.20, unfair prejudice "is not merely damaging evidence, [or] even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Bell*, 719 N.W.2d 635, 641 (Minn. 2006) (quotation omitted).

Evidence that Soderbeck had threatened D.S. in the past and that she was tired of Soderbeck's threatening behavior illuminated the nature of the relationship between Soderbeck and D.S. and helped the jury to assess D.S.'s credibility. It did not give the

---

[2] A 2013 amendment to Minn. Stat. § 634.20 replaced the phrases "similar conduct" and "domestic abuse" with "domestic conduct." *See* 2013 Minn. Laws ch. 47 § 7, at 208. Because the amended statute retains the original underlying definition of "similar conduct" for the definition of "domestic conduct," we do not discern a substantive change that affects our analysis in this case, and we therefore continue to rely on caselaw interpreting the prior version of the statute. *Compare* Minn. Stat. § 634.20 (2012), *with* Minn. Stat. § 634.20 (Supp. 2013). This approach is consistent with *State v. Fraga*, ___ N.W.2d ___, ___, 2015 WL 1810487, at *11 n.12 (Minn. Apr. 22, 2015), in which the supreme court noted that "the 2013 amendment did not change the underlying definition" and concluded that "this change of phrase is not material for the purpose of this case."

state an unfair advantage. The district court therefore did not abuse its discretion by allowing Sergeant Haider to testify that D.S. told him that Soderbeck threatened to punch her in the past, and it was not plain error to allow D.S. to testify that she was tired of Soderbeck's threatening behavior.

Soderbeck also contends that the district court erred by allowing Sergeant Haider to testify that Soderbeck made threatening comments while in custody. Because Soderbeck objected to the testimony, we review for an abuse of discretion. *Amos*, 658 N.W.2d at 203.

Sergeant Haider testified that Soderbeck told him that "if he had f--king threatened f--king somebody, somebody would have been dead" and that Soderbeck also said: "Because I would have pulled the trigger if I had a gun, along with your f--king boys." In closing argument, the prosecutor characterized the statements as a threat to the police. Soderbeck argues that the testimony was inadmissible evidence of other bad acts under Minn. R. Evid. 404(b).

Evidence of other bad acts is not admissible to prove that a defendant acted in conformity with his character. Minn. R. Evid. 404(b); *State v. Spreigl*, 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). But the evidence may be admissible for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Minn. R. Evid. 404(b).

The supreme court has developed five requirements for admission of other-acts evidence:

> (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*State v. Ness*, 707 N.W.2d 676, 685-86 (Minn. 2006). The state did not comply with those requirements, and the district court did not address them. We therefore conclude that admission of testimony regarding Soderbeck's threatening statements at the jail was error. But the error is not grounds for reversal unless there is "a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict."[3] *State v. Fardan*, 773 N.W.2d 303, 320 (Minn. 2009) (quotation omitted). If such a possibility exists, then the error is prejudicial and a new trial is required. *Id.*

Soderbeck argues that the evidence "was damaging to [him] because it showed that he was a bad person and that he had a propensity to threaten people." Soderbeck also argues that "the prejudicial effect of this evidence . . . was not limited by the [district] court" because the district court "did not give the jury limiting instructions regarding . . . other bad-acts evidence."

---

[3] The supreme court recently stated that "[t]he erroneous admission of *Spreigl* evidence is harmless unless it substantially influenced the verdict." *State v. Campbell*, 861 N.W.2d 95, 102 (Minn. 2015). It is unclear whether *Campbell* represents a deliberate change to the harmless-error test in *Spreigl* cases, which previously considered whether there was "a *reasonable possibility* that the wrongfully admitted evidence significantly affected the verdict." *Fardan*, 773 N.W.2d at 320 (emphasis added) (quotation omitted). The reasonable-possibility test is more favorable to defendants than the test articulated in *Campbell*. We need not decide whether the test has substantively changed because the erroneous admission of the jail-threats evidence is not grounds for reversal even under the reasonable-possibility standard.

A district court's failure to give a limiting instruction does not constitute reversible error unless a defendant requests such an instruction. *State v. Williams*, 593 N.W.2d 227, 237 (Minn. 1999). Moreover, there is not a reasonable possibility that evidence of the jail threats affected the verdict in this case. The state presented a strong case regarding the terroristic threats charges. D.S. and A.S. testified that Soderbeck threatened them on October 29. And Soderbeck does not explain how any perceived propensity to threaten people could have affected the verdict on the possession charge. We therefore conclude that the erroneous admission of evidence regarding the jail threats is not grounds for reversal.

*Cumulative Error*

Soderbeck contends that "even if each evidentiary error, standing alone, is not sufficiently prejudicial to warrant a new trial, a reviewing court must reverse where the cumulative effect of several errors deprived a criminal defendant of a fair trial. *See State v. Litzau*, 650 N.W.2d 177, 187 (Minn. 2002) (granting a new trial where "the cumulative effect" of multiple errors deprived the defendant of a fair trial). Soderbeck argues that the state used "a plethora of inadmissible evidence to unfairly persuade the jury to convict [him]." Specifically, he argues that the jury "was told that [he] hid from the police, made the police officer very concerned for his safety, refused to give a DNA sample to police" and that he "threatened D.S. before (who was always calling the police on him), had often threatened to punch D.S., was angry and threatening toward the police officer who interviewed him in the jail, and that the gun was loaded when it was found."

Soderbeck relies on *State v. Smith*, arguing that the state unfairly persuaded the jury to convict based "on a ground different from proof specific to the offense charged." 749 N.W.2d 88, 95 (Minn. App. 2008) (quotation omitted). Smith was tried for possession of a firearm by an ineligible person. *Id.* at 91. The district court allowed the state to introduce, under Minn. R. Evid. 404(b), evidence of Smith's prior conviction for possession of a firearm by an ineligible person and a photograph of Smith standing next to a table containing handguns. *Id*. at 91-92.

On appeal, this court reasoned that "because the prior and current charges are identical, that in itself might have been enough to lure a juror into a sequence of bad character reasoning," such as thinking that "Smith is a possessor of guns; that is what he does, and he does it regularly." *Id*. at 95 (emphasis omitted) (quotation omitted). This court also reasoned that the photograph conveyed that Smith was a "gun-toting gangster." This court concluded that "[e]ach of the *Spreigl* items is independently excludable under the 404(b) balancing test," and "[t]aken together—as happened at trial—the danger of unfair prejudice increased immensely and likely made it impossible for the jury to resist the nearly overwhelming character implication the evidence invited." *Id*. at 97.

Soderbeck argues that, as in *Smith*, the "overwhelming negative character implications of the evidence created a trial environment which painted [him] as a dangerous offender" and "undoubtedly distracted the jury from deciding whether the state had legitimately proved that [he] was guilty." Ultimately, we are not persuaded. Although Soderbeck alleged several evidentiary errors, he has established only two: admission of Officer Nelson's testimony regarding his concern for his safety and

20

admission of Sergeant Haider's testimony regarding Soderbeck's threatening statements at the jail.[4] Officer Nelson's testimony regarding his safety concern was not based on a separate act of gun possession by Soderbeck. It was based on the charged act of gun possession. And Soderbeck's threatening statements at the jail were vague compared to his specific threats to kill his mother and nephew. Because the errors here did not result in admission of evidence showing conduct identical to the charged conduct, they did not create a risk of unfair persuasion comparable to the circumstances in *Smith*.

Soderbeck also argues that "[t]here is at least a reasonable possibility that the wrongfully admitted evidences significantly affected the verdict because the jury was not quick to reach a verdict regarding the gun possession charge" and "it asked the court questions about it." The jury asked, "does it matter if [Soderbeck] knew where the gun was on 10/29 or had any idea the gun was in the house at any time?" That question merely suggests uncertainty about when Soderbeck possessed the gun; it does not suggest doubt regarding his possession. Moreover, we are not persuaded that the question resulted from Officer Nelson's testimony regarding his safety concern or Sergeant Haider's testimony regarding Soderbeck's threatening statements at the jail. In sum, the

---

[4] We do not include Soderbeck's alleged, but unobjected-to, errors in our cumulative-error analysis. "[R]eview of unobjected-to errors is discretionary," and an appellate court only assesses "whether it should address the error" if it first concludes that there was "(1) error; (2) that is plain; and (3) the error . . . affect[s] substantial rights." *Griller*, 583 N.W.2d at 742, 740. Because Soderbeck has not satisfied the plain-error factors, we do not consider his alleged, but unobjected-to, errors when assessing cumulative error.

two established evidentiary errors did not cumulatively deprive Soderbeck of an unfair trial.

**Affirmed.**